Linda THIELE, Guardian of the Person and Estate of Craig Thiele, Plaintiff–Appellant,

v.

NORFOLK & WESTERN RAILWAY COMPANY, Defendant–Appellee.

No. 95–1083.

United States Court of Appeals, Seventh Circuit.

Argued May 12, 1995.

Decided Oct. 12, 1995.

Robert A. Clifford, Chicago, IL, Philip H. Corboy, David C. Wise (argued), David C. Wise, J.M. Dudley, Robert J. Bingle, Corboy & Demetrio, Chicago, IL, G. Stanley Hood, Roby & Hood, Fort Wayne, IN, for Plaintiff–Appellant.

John C. Duffey (argued), Russell H. Hart, A. James Chareq, Stuart & Branigin, Lafayette, IN, for Defendant–Appellee.

Before BAUER, MANION, and KANNE, Circuit Judges.

KANNE, Circuit Judge.

Craig Thiele was severely injured when a Norfolk & Western freight train collided with his car at a railroad crossing in Yoder, Indiana. Thiele's guardian sued the railroad, alleging that it had been negligent in failing to install adequate warning devices at the crossing and in placing a signal control box near the tracks. The district court granted summary judgment against Thiele, finding that his claims were preempted by federal law and, alternatively, that no reasonable jury could find in his favor. We affirm.

## I. Background

Yoder is a small town in Allen County in northern Indiana. Its major road is, aptly enough, Yoder Road, a two-lane road that runs east-west. Two sets of railroad tracks running north-south intersect Yoder Road at the crossing where Thiele's accident occurred.

At the time of the accident, several passive warning devices guarded the Yoder Road crossing. Pavement markings and a round, yellow-and-black railroad sign, located about five hundred feet on the west side of the crossing, warned eastbound motorists of the approaching crossing. The area around the crossing was flat, so the crossing itself was visible from some distance. Closer to the intersection on both sides were crossbucks, the familiar reflective signs with crossed arms. Additionally, stop signs were placed prominently in front of the tracks. All these devices had been in place some time before the accident; the federal government had no role in their installation or upkeep.

In October 1991, Norfolk & Western ("NW"), Allen County, and the Indiana Department of Transportation executed an agreement to upgrade the warning devices at the Yoder Road crossing. The plan called for automatic gates and flashing lights to supplement the already existing passive warning devices. The agreement specified building procedures, construction materials, and the construction schedule. The agreement was contingent on approval by the Federal Highway Administration ("FHA"); the

FHA approved the entire agreement on November 19, 1991. Federal funds were to finance 90% of the project, with Allen County providing the rest.

Shortly before the accident, the railroad began installing the gates and flashers. Some holes had been dug and posts installed for the gates, but no part of the new devices was operational. A signal control box for the new devices had, however, been installed in the northwest corner of the crossing.

On March 6, 1992, at about noon, Craig Thiele drove toward the tracks from the west. He drove through the stop sign without stopping and stopped on the tracks, according to several eyewitnesses. A NW train approached from the north and repeatedly sounded its whistle. Thiele remained on the tracks; his car was later found in the "Park" gear position. The train struck Thiele's car, and he was severely and permanently injured. Thiele's guardian brought this diversity suit.

## II. Analysis

■ The district court granted summary judgment for NW, holding that the Federal Railway Safety Act of 1970 ("FRSA"), 49 U.S.C. § 20101 et seq.,[1] preempted Thiele's claims of inadequate warning devices at the Yoder Road crossing, as well as his claims of negligent placement of the signal control box. We review a district court's grant of summary judgment de novo. Hedberg v. Indiana Bell, 47 F.3d 928, 931 (7th Cir.1995). We draw all reasonable inferences in favor of the nonmoving party. Id. A district court must grant summary judgment where the record before it shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

■ There is a presumption against finding federal preemption of state law. CSX Transp., Inc. v. Easterwood, — U.S. —, —, 113 S.Ct. 1732, 1739, 123 L.Ed.2d 387 (1993). "Pre-emption will not lie unless it is 'the clear and manifest purpose of Con-

---

**1.** At the time of the decision below, the FRSA was codified at 45 U.S.C. § 421 et seq.

gress.'" *Id.* at —, 113 S.Ct. at 1737 (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)). The FRSA, a comprehensive system of railway safety regulations, explicitly provides that it and connected regulations preempt state law, but it allows state law to continue in effect "until the Secretary of Transportation prescribes a regulation or issues an order covering the subject matter of the State requirement." 49 U.S.C. § 20106.

Two regulations adopted by the Secretary are relevant to Thiele's case.[2] Both regulations apply "on any project where Federal-aid funds participate in the installation of" warning devices at railroad crossings. 23 C.F.R. § 646.214(b)(3) provides that on such a federally aided project warning devices must include automatic gates if any one of several listed conditions is present. *See Shots v. CSX Transp.,* 38 F.3d 304, 306 (7th Cir.1994). 23 C.F.R. § 646.214(b)(4) provides that if subsection (b)(3) does not mandate the installation of automatic gates and flashers, "the type of warning device to be installed … is subject to the approval of" the Secretary. *See Shots,* 38 F.3d at 306. Subsection (b)(3) applied to the Yoder Road crossing upgrade—the crossing had multiple tracks, a condition specified in (b)(3), and the crossing was to receive the warning devices specified in (b)(3), automatic gates with flashing lights.

The Supreme Court examined § 646.214(b)(3)–(4) in *Easterwood,* — U.S. —, 113 S.Ct. 1732. The Court specifically addressed when subsections (b)(3) and (4) preempt state tort claims of inadequate warning devices. It held that "for projects in which federal funds participate in the installation of warning devices, the Secretary has determined the devices to be installed and the means by which railroads are to participate in their selection. The Secretary's regulations therefore cover the subject matter of state law…." *Id.* at —, 113 S.Ct. at 1741.

In *Easterwood,* CSX had agreed to install automatic gates at a crossing, the Secretary

had approved the plan, federal funds had been set aside, and motion detection circuitry had been installed. However, the upgrade was never completed because the city declined to approve a necessary, related street project. Eventually the federal funds set aside for the upgrade plan were transferred to another project. The Supreme Court held that the regulations did not preempt the claims of inadequate warning devices, because it was "not establish[ed] that federal funds 'participate[d] in the installation of the [warning] devices' at [the crossing]." *Id.* at —, 113 S.Ct. at 1741.

■ *Easterwood* thus instructs that federal financial participation in a railroad crossing upgrade is necessary for preemption under § 646.214(b)(3)–(4). Courts have interpreted *Easterwood* as providing that the mere fact of some federal financial participation is not necessarily sufficient to trigger preemption. The Tenth Circuit has held that the degree of participation must be "significant," rather than merely a "casual financial connection." *Armijo v. Atchison, Topeka & Santa Fe Ry. Co.,* 19 F.3d 547, 550 (10th Cir.1994). The Eighth Circuit has held that federal financial participation triggers preemption only when warning devices have been completely installed and are operating. *St. Louis S.W. Ry. Co. v. Malone Freight Lines,* 39 F.3d 864, 866–67 (8th Cir.1994), *cert. denied,* — U.S. —, 115 S.Ct. 1963, 131 L.Ed.2d 854 (1995). *See also Hester v. CSX Transp., Inc.,* 61 F.3d 382 (5th Cir.1995) (finding preemption after extensive participation of federal funds and completed installation of warning devices).

This Circuit has only once addressed the preemptive effect of § 646.214(b)(3)–(4) in light of *Easterwood.* In *Shots,* 38 F.3d at 306, CSX had agreed with the State of Indiana to make minimal upgrades at several thousand crossings, adding crossbucks where before there had been no warning devices. The Secretary of Transportation approved the upgrade plan generally, but did not specifically approve the crossbucks as adequate warning devices pursuant to § 646.214(b)(4).

---

**2.** These regulations were actually promulgated under the authority of the Highway Safety Act of 1973, 23 U.S.C. § 101 *et seq.* They are, however,

subject to the FRSA's preemption provisions. *See Shots v. CSX Transp.,* 38 F.3d 304, 306 (7th Cir.1994).

However, the federal government provided funds for the upgrade. We held that the mere fact of federal financial participation in a warning system upgrade did not automatically preempt state law tort claims. *Id.* at 307. Instead, we held that for warning systems subject to subsection (b)(4), the Secretary's specific approval of a warning system, in addition to federal financial participation, was necessary for preemption. *Id.* at 308–09.

NW contends, and the district court found, that preemption necessarily occurred when the Secretary approved the agreement for the upgrade on November 19, 1991. Thiele argues that preemption only occurred when the devices were installed and operational, i.e., after his accident. NW argues that *Shots* dictates the result it wants, even though in *Shots* the accident occurred after installation was complete. NW relies on dicta from *Shots* that "[w]e do not doubt that the Secretary can approve a warning device before or after its installation." 38 F.3d at 308. NW interprets this to mean that the Secretary's November 19 approval necessarily triggered preemption. However, we interpret *Shots* differently.

Initially, we note that the Secretary's November 19 approval was a different type of approval than that we discussed in *Shots*. In *Shots*, the railroad, with federal aid, had installed devices that were not the automatic gates prescribed by § 646.214(b)(3). Interpreting subsection (b)(4), which requires the Secretary to approve the devices as adequate, we held that the Secretary's specific approval was necessary for preemption. *Shots*, 38 F.3d at 306–07. We focused on whether that approval was necessary even though federal financial participation had already occurred; we concluded that it was.

In contrast, the warning devices at issue in this case are the type explicitly prescribed by § 646.214(b)(3); the Secretary does not have to approve them as adequate for each particular crossing. The FHA does have to approve the entire plan in order for the project to proceed to actual construction, but that is pursuant to a different regulation, 23 C.F.R. § 646.216(e)(2)(i). The November 19 approval was that sort of general approval, a totally different sort of approval than the approval we discussed in *Shots*. Therefore, the language of *Shots* in no way dictates the conclusion that Thiele's claim is preempted.

Nonetheless, the Secretary did prescribe the warning devices to be installed at the Yoder Road crossing, and federal dollars did participate in the project, so we must address if those facts preempt Thiele's claim. We think that NW reads *Shots* and *Easterwood* too broadly: neither addressed whether state law claims are preempted when an accident occurs before installation of federally prescribed warning devices but after federal financial participation and approval.

We now hold that when § 646.214(b)(3) or (4) applies to a crossing upgrade, there is no preemption of state law adequacy of warning claims until the warning devices are installed and fully operational. We are not alone in this conclusion: almost every other court that has considered the issue has come to the same conclusion. In *Malone*, the Eighth Circuit, in a case essentially identical to Thiele's, held that federal funds could not be said to have "participated in installation," as required for preemption under *Easterwood*, until installation was complete and the warning devices were operating. 39 F.3d at 867. We agree with *Malone* and similar cases with the same holding. *See Hester*, 61 F.3d at 386 n. 6 (citing *Malone* and agreeing that for preemption to occur "there must be an actual, authorized expenditure of federal funds in the installation or placement of safety devices at the particular crossing"); *Earwood v. Norfolk So. Ry. Co.*, 845 F.Supp. 880, 886–87 (N.D.Ga.1993) (preemption triggered by actual installation of warning devices, not by mere planning and preliminary work); *Carpenter v. Consolidated Rail Corp.*, 69 Ohio St.3d 259, 631 N.E.2d 607, 610 (1994) (same); *see also Armijo*, 19 F.3d at 551 (federal participation short of approval of upgrade inadequate to trigger preemption); *but see Hatfield v. Burlington Northern R.R. Co.*, 64 F.3d 559 (10th Cir. 1995) (holding, without citing either *Malone* or *Hester*, that federal participation short of installation was sufficient to trigger preemption).

**184**

The conclusion of *Easterwood* supports our conclusion. There, the upgrade project was underway at the time of the accident. The Secretary (through the FHA) had approved the upgrade plan for automatic gates. *See Malone,* 39 F.3d at 866. Motion-detection circuitry had been installed (although it was also to serve an adjacent crossing and so was not tied exclusively to the crossing at issue). The Supreme Court found no preemption, even though there was a federally approved agreement to upgrade the crossing and related work had begun. *Easterwood,* — U.S. at ———–———, 113 S.Ct. at 1741–42. Nonetheless, NW would have us find that preemption exists in the very similar circumstances before us. We decline the invitation.

Our conclusion also conforms to common sense because otherwise the public would be unprotected by either state or federal law for the period between federal approval and actual warning device installation. Before any agreement to upgrade was concluded, NW was fully subject to suit under state tort law. We see nothing anomalous in continuing to impose liability on NW for the warning system NW had earlier chosen until the new system actually superseded the old. *See Malone,* 39 F.3d at 867 (noting that otherwise the public would be unprotected between the time of the upgrade plan's approval and completion of installation); *Earwood,* 845 F.Supp. at 887 (noting that an opposite conclusion would create "confusion and 'gaps' where no entity was responsible for railway crossing safety").

Moreover, adopting the rule NW proposes would mean that for projects where the federal government approved warning devices or prescribed them for a particular crossing, but for some reason the project was never completed (*e.g.,* lack of funding or failure of another entity, such as the county or city, to perform some action), the public would be unprotected indefinitely, even though nothing had actually changed at the crossing. That would hardly fit with the FRSA's goal of increasing safety at railroad crossings. *See*

49 U.S.C. § 20101; *Easterwood,* — U.S. at ——, 113 S.Ct. at 1736.

NW points out that the agreement it signed set up a schedule for installation. It argues that therefore its hands were tried, because even had it wanted to install additional warning devices to protect motorists, it had to conform to the schedule. However, the plan did not forbid stopgap measures, such as flagmen. Thus, the railroad was not truly stuck with only the old system during the time of the upgrade's construction. Additionally, the county may have had a contractual duty to provide additional safety devices, but that does not affect NW's common law duty to the public.

Those reasons, together with the Supreme Court's admonition that there exists a presumption against preemption, lead us to disagree with the district court's conclusion that federal regulations preempted Thiele's claim. However, we do agree with the alternate ground upon which the district court granted summary judgment, that Indiana's Comparative Fault Act barred Thiele from any recovery.

■ Indiana law provides that a plaintiff cannot recover if his comparative fault is greater than that of other culpable parties. IND.CODE § 34–4–33–4. Here only NW was subject to liability, so if Craig Thiele was more than 50% at fault, he cannot recover. While the degree of comparative fault is normally a question for the factfinder, a court may apportion fault " 'when there is no dispute in the evidence and the factfinder is able to come to only one logical conclusion.' " *McKinney v. Public Serv. Co.,* 597 N.E.2d 1001, 1008 (Ind.Ct.App.1992) (quoting *Robbins v. McCarthy,* 581 N.E.2d 929, 934–35 (Ind.Ct.App.1991)).

■ No reasonable jury could find otherwise than that Thiele was more than 50% responsible for his accident. Thiele was familiar with the crossing: he admits he knew it was there and that he had crossed it before. Uncontradicted eyewitnesses testified that Thiele drove onto the tracks in daylight without stopping at the stop sign and then stopped once he was on the tracks.[3]

**3.** Thiele cannot remember any of the events surrounding the accident, so we have only the eyewitness accounts to consider.

 

His failure to stop violated his statutory duty to stop and exercise due care before proceeding. IND.CODE § 9–21–4–16.[4] That violation of his statutory duty alone necessarily constituted some degree of negligence under Indiana law. *French v. Bristol Myers Co.,* 574 N.E.2d 940, 943 (Ind.Ct.App.1991).

Furthermore, the train crew repeatedly sounded the whistle while Thiele stayed on the tracks, using long blasts, short blasts, and a staccato emergency call. The train's light was on its brightest setting. There is no genuine dispute that while Thiele was on the tracks, the approaching train was both clearly visible and audible.[5] Thiele's car was found in the "Park" gear position after the accident. No reasonable jury could find otherwise than that Thiele violated his duty to exercise reasonable care for his own safety and his statutory duty to stop, and that his negligence was more than 50% responsible for his injuries. Therefore, we AFFIRM the district court's grant of summary judgment.

---

4. That code section provides: "When a stop sign is erected at a railroad crossing, the driver of a vehicle shall stop within fifty (50) feet but not less than ten (10) feet from the nearest track of the grade crossing and shall proceed only upon exercising due care."

5. Thiele claims that the railroad negligently placed the signal control box in the line of sight. Whether or not the railroad was negligent in that placement, Thiele bore more than 50% of the responsibility of the accident, measured against the total negligence a reasonable jury could impute to the railroad. Thiele could see the train before and after the box allegedly blocked his line of sight. The box was only a few feet wide, and it could not have blocked Thiele's sight once he was stopped on the tracks. Because we find against Thiele on this claim, we decline to address whether the FRSA preempts Thiele's claim based on the control box placement.