. **Varden C. MILLER, Plaintiff,**

v.

**CHICAGO AND NORTH WESTERN TRANSPORTATION COMPANY, Defendant.**

**No. 94 C 5176.**

United States District Court,
N.D. Illinois,
Eastern Division.

May 6, 1996.

J. Dillon Hoey, James Farina, Brian Walker, Patrick Walsh, Hoey & Farina, Chicago, IL, for Plaintiff.

George Brugess, Chicago & Northwestern Transportation Company, Chicago, IL, for Defendant.

*MEMORANDUM OPINION
AND ORDER*

SHADUR, Senior District Judge.

Defendant Chicago & North Western Transportation Company ("C & NW") has filed a motion in limine that poses a thorny question as to expert testimony proposed to be offered by plaintiff Varden Miller ("Miller"). C & NW seeks to keep Eugene Holland ("Holland") from testifying about whether C & NW complied with (1) regulations promulgated pursuant to the Occupational Safety and Health Act ("OSHA," 29 U.S.C. §§ 651 to 678), (2) the Melrose Park Building

Code and (3) the safety recommendations published by the American National Standards Institute ("ANSI").

For the reasons stated in this memorandum opinion and order, C & NW's motion is denied in principal part. Holland will be allowed to utilize all three sets of standards in his expert testimony, although the extent to which he may base his testimony on OSHA regulations must be somewhat curtailed.

## Background

Because the background of this action was set out in detail in this Court's November 22, 1995 memorandum opinion and order (the "Opinion," 1995 WL 702615), only a brief recital of the facts is necessary here. On August 29, 1993 Miller was employed as a C & NW diesel locomotive engineer when he fell into an 8 to 10 foot deep open maintenance pit at C & NW's Melrose Park Diesel Shop. Although protective chains could have been connected to metal poles already in place along the sides of the pit, it is uncontroverted that pursuant to C & NW's standard practice neither the chains nor any other guards were in place at the time of the accident.[1] Miller suffered significant closed head injuries as a result of the fall.

Miller has brought this action under the Federal Employer's Liability Act ("FELA," 45 U.S.C. §§ 51–60), alleging that C & NW was negligent (1) in leaving hazards on the walkway next to the pit and (2) in failing to protect its workers from falling into the pit. After the parties had essentially completed pretrial discovery C & NW moved for summary judgment, and the Opinion granted that motion on Miller's first theory but denied it on the second, ruling that there was a genuine and material issue of fact as to whether C & NW was negligent on that score.

Miller plans to offer Holland's testimony to show that a reasonable person would have had protective guards around the pit and that C & NW's failure to have the chains in place was negligent. This Court's March 22, 1996 oral ruling rejected C & NW's initial argument that Holland did not meet the "expert witness" requirements of Fed.R.Evid. 702. C & NW now urges that Holland should be barred from testifying because all three sets of standards that he has drawn upon in reaching his expert opinion are preempted by the actions of the Federal Railroad Administration ("FRA") pursuant to the Federal Railroad Safety Act ("FRSA," 45 U.S.C. §§ 421 to 444[2]).

This opinion will address each of the potential bases for Holland's testimony in turn, but first a more general point about preemption is in order. Both C & NW and Miller have discussed the issues as though covered by a single preemption question: Has the FRA acted in such a way as to preempt the various bases of Holland's testimony? But both parties have used meat axes when scalpels are better suited to the task—each has failed to see the subtle but important differences in how the preemption question should be framed for the various standards on which Holland would rely:

1. Because OSHA regulations are issued by one federal agency and C & NW claims that another federal agency (FRA) has preempted OSHA's regulatory authority, the question there involves the possible preemption of one agency's regulations by another.

2. Whether the Melrose Park Building Code is preempted by FRA action presents the quite different question of whether and how a local regulation is preempted by the actions of a federal agency.

3. Because the ANSI standards are a non-binding set of recommendations promulgated by a private group, whether FRA's actions have any preemptive effect calls for an entirely different type of analysis.

---

1. Apparently that was done because the chains would have lessened somewhat the otherwise easy access onto the locomotives.

2. Although in 1994 FRSA was amended and moved to 49 U.S.C. §§ 20101 to 21311, this opinion will cite to FRSA provisions (as "FRSA § —") as they were at the time of Miller's injury in 1993.

With that backdrop in place, it is time to turn to the issues raised by C & NW's motion in limine.

### OSHA Regulations

■ As for the OSHA regulations, C & NW's argument is that FRA has formally excluded open pits at railroad repair shops from OSHA regulation, so that it would be improper to allow testimony based on standards that don't even apply. C & NW's contention begins with FRSA § 421:

> The Congress declares that the purpose of this chapter is to promote safety in all areas of railroad operations and to reduce railroad-related accidents, and to reduce deaths and injuries to persons and to reduce damage to property caused by accidents involving any carrier of hazardous materials.

FRSA § 431 then vests the Secretary of Transportation—through FRA—with the task of carrying out that purpose:

> The Secretary of Transportation ... shall (1) prescribe, as necessary, appropriate rules, regulations, orders and standards for all areas of railroad safety supplementing provisions of law and regulations in effect on October 16, 1970, and (2) conduct, as necessary, research, development, testing, evaluation, and training for all areas of railroad safety.

Those provisions must also be read in conjunction with OSHA § 653(b)(1):

> Nothing in this chapter shall apply to working conditions of employees with respect to which other Federal agencies ... exercise statutory authority to prescribe or enforce standards or regulations affecting occupational safety or health.

That last section, aptly referred to by some courts as a "negative preemption provision," is designed to reduce regulatory overlap among agencies by divesting OSHA of regulatory authority when another agency is better qualified to regulate in a particular area. Thus the nature of the inquiry is clear: Has FRA "exercise[d] statutory authority" in such a way that OSHA's negative preemption provision kicks in, divesting OSHA of regulatory authority?

C & NW urges an affirmative answer, pointing to a policy statement issued by FRA on March 14, 1978 (the "Policy Statement," 49 Fed.Reg. 10,583 (1978)) that set out FRA's views "concerning the relationship between the respective jurisdictions of FRA and OSHA" (*id.* at 10,584). In the relevant portion of the Policy Statement FRA describes several areas in which OSHA regulations would otherwise apply but as to which, says FRA, its own special regulatory expertise is essential (*id.* at 10,587). Because of its importance in resolving all of the issues raised in this motion in limine, one passage of the Policy Statement (*id.*) is quoted at length:

> Walking–Working Surfaces (Subpart D)
>
> OSHA regulations concerning working surfaces deal with such matters as ladders, stairways, platforms, scaffolds and floor openings. Generally, these regulations are applicable in railroad offices, shops, and other fixed work places. There are three principal exceptions to the rule.[3]
>
> \* \* \* \* \* \*
>
> Second, as the agency which has exercised jurisdiction over railroad operations, FRA is responsible for the safe movement of rolling stock through railroad repair shops. OSHA requirements for general industry are in some respects inconsistent with the optimum safety of employees in this unique environment where hazards from moving equipment predominate. Therefore, OSHA regulations on guarding of open pits, ditches, etc., would not apply to inspection pits in locomotive or car repair facilities. FRA is better equipped to assess proper clearance technology and employee knowledge of existing industry practices as well as the relevance and severity of hazards represented by specific injury occurrence codes in accident/inci-

---

**3.** [Footnote by this Court] Two of those exceptions are "the design of locomotives and other rolling equipment used on a railroad" and "ladders, platforms, and other surfaces on signal masts, cantenary [sic] systems, railroad bridges, turntables, and similar structure or ... walkways besides the tracks in yards or along the right-of-way" (43 Fed.Reg. at 10,587). Neither of those is relevant here, so the text of this opinion quotes only the exception dealing with repair facilities.

dent reporting statistics. FRA is responsible for determining what additional regulatory steps, if any, may be necessary in this area in light of overall safety considerations.

According to C & NW the Policy Statement makes this a slam-dunk issue—Holland should be precluded from testifying about OSHA regulations because FRA has said such regulations are not applicable to open pits in railroad repair facilities.

Miller disagrees. His main argument is that some courts have admitted testimony about OSHA regulations as "some evidence" of the standard of care in FELA cases (e.g. *Robertson v. Burlington N. R.R.*, 32 F.3d 408, 409–11 (9th Cir.1994); *Ries v. National R.R. Passenger Corp.*, 960 F.2d 1156, 1158–65 (3d Cir.1992); *Albrecht v. Baltimore & O. R.R.*, 808 F.2d 329, 332–33 (4th Cir.1987)), and one court has even allowed testimony about a defendant's violation of OSHA regulations to be considered as per se evidence of negligence (*Pratico v. Portland Terminal Co.*, 783 F.2d 255, 264–67 (1st Cir.1985)).

But those cases, although relevant (as will become clear in a moment), are not directly on point as to the first issue that must be decided: whether the Policy Statement is an exercise of statutory authority sufficient to invoke OSHA's negative preemption provision. Only two courts appear to have confronted that issue, and they have given different answers to the question (contrast *Velasquez v. Southern P. Transportation Co.*, 734 F.2d 216, 218 (5th Cir.1984) with *Manes v. Metro–North Commuter R.R.*, 801 F.Supp. 954, 964 (D.Conn. 1992)). But what tips the scales is that OSHA itself has read the Policy Statement as sufficient to trigger the negative preemption provision and to make OSHA regulations inapplicable to railroad inspection pits (*Consolidated Rail Corp. ("Conrail II")*, 10 O.S.H. Cas. (BNA) 1577 (1982)). And of course this Court must defer to an agency's reasonable interpretation of its own organic statute (*Chevron U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984)).

Interestingly enough, OSHA itself has obviously viewed the question as a close one.

*Conrail II* overturned a decision made by the OSHA Review Commission just one year earlier in *Consolidated Rail Corp. ("Conrail I")*, 9 O.S.H. Cas. (BNA) 1258 (1981). In *Conrail I* a majority had held that the FRA Policy Statement did not invoke OSHA's negative preemption provision because the Statement had not undergone the rigors of notice-and-comment rulemaking and thus was not a rule that had the "force and effect of law," as required to displace OSHA regulations (*id.* at 1260–61). Commission Chairman Cleary dissented in *Conrail I*, urging that the Policy Statement was a sufficiently formal pronouncement by FRA to displace FRA rules (*id.* at 1263). Chairman Cleary's view became that of the majority in *Conrail II*, with Commissioner Cottine dissenting based on the *Conrail I* majority's reasoning. But all of that is of purely historical interest, for OSHA's now 14–year–old position is that pronounced in *Conrail II*, and this Court defers to that interpretation under *Chevron*. Thus Holland will not be allowed to testify that C & NW was bound by the OSHA regulations.

 That does not, however, end the discussion. Even though a violation of the OSHA promulgation (if proved) would not bind C & NW, it still remains to be considered whether Miller can identify that OSHA standard as relevant to his opinion as to what due care is required of C & NW. As stated earlier, some courts have allowed OSHA regulations to be admissible as evidence of the standard of care in an FELA case even when there is no question that the OSHA regulations were not applicable as such.

In its effort to foreclose any such possibility, C & NW has materially mischaracterized what FRA has said and done in this area. It will be recalled that FRA has said generally that OSHA regulations are "in some respects inconsistent with the optimum safety of employees in th[e] unique environment" of railroad repair facilities, rendering those regulations inapplicable there. But it is false to say, as C & NW Mem. 4–5 would have it, that "the CNW cannot be negligent for failing to put up chains at the pit when the FRA has determined that such chains create more hazards than they eliminate when moving equipment and close clearances are in-

volved." No such FRA "determination" that the attachment of guard chains *creates* hazards in the situation at issue in this litigation (involving a locomotive that is wholly at rest while being repaired) is contained either in the Policy Statement or in any other FRA pronouncement identified by C & NW[4]—indeed, this Court's search has uncovered no statement of any nature by FRA regarding open pits in repair facilities during the 18 years since issuance of the Policy Statement. And it should be reemphasized that the only context in which FRA's Policy Statement had referred to OSHA regulations as "in some respects inconsistent with the optimum safety" of railroad employees in the repair shop environment was in terms of FRA's "responsib[ility] *for the safe movement of rolling stock through*" such shops.

In view of that statement and the statements from *Conrail II* quoted in n. 4, even the hyperbolic contention in C & NW's Memorandum quoted in the preceding paragraph of the text is problematic in its own terms. In each instance what the Policy Statement and *Conrail II* speak of is one of the special problems posed by railroads—safety concerns implicating their "rolling stock" and "moving equipment." But a prohibition against permanent guardrails, or even the attachment of chains, where moving equipment is involved is very different from a prohibition against attaching chains when a wholly static condition is at issue. Indeed, what is C & NW's explanation for its having poles in place along the pit—and guard

chains available to connect them—at all? If its present argument were to be credited—if it were never permissible to attach chains at all—the only possible use of the C & NW installation would be to serve an illegal purpose outlawed by FRA![5] And if·such is not the case, surely there is room for the contention that whether chains ought to be erected is a function of the specific situation at hand—another way of saying that the question is one of what due care reasonably calls for under the circumstances.

Miller's FELA claim includes the burden of showing that C & NW did not act as a reasonable person would have under the circumstances. As Miller's designated expert on the subject of due care, Holland may permissibly consider the OSHA regulations as relevant to what reasonable safety precautions are called for regarding open pits generally. Hence Holland will be allowed to use OSHA's standards as part of the basis for his opinion as to what a reasonable person would do to protect an open pit, although he may not of course testify that C & NW was bound by those standards.[6] Naturally C & NW will be allowed to cross examine on the basis, or to offer its own affirmative evidence, that what is called for by OSHA regulations does *not* represent a reasonable standard of care for open pits in railroad repair facilities (including in that respect the right to show that OSHA itself does not expose railroads to those regulations). This Court also will insure that the jury instructions reflect what has been said here.[7]

---

4. *Conrail II*, 10 O.S.H. Cas. (BNA) at 1580 referred to FRA as having "explained that standard guardrails at these platforms and pits would create greater hazards than they would alleviate." As *Conrail II, id.* went on to explain, FRA was concerned with the "guarding of open pits . . . in repair facilities" in the context of the "movement of rolling stock through repair shops." In that light, what OSHA's Commissioners perceived as FRA's prohibition of full-time guardrails is not at all the equivalent of the extension of that proposition that is now urged by C & NW.

5. This Court does not suggest that C & NW really wishes to paint itself into that corner. Instead the just-suggested reductio ad absurdum calls for the discrediting of C & NW's contention, and this Court does so.

6. Even *Velasquez*, the case most firmly in C & NW's corner, did not reject this approach. Al-

though *Velasquez* held it was reversible error to give a jury instruction that OSHA regulations actually applied to the railroad in that case, it expressed no view on the position taken in the text here (734 F.2d at 219 n. 2):

Because we hold that the court's instruction to the jury constitutes reversible error, we need not reach the issue of whether the introduction of OSHA regulations into evidence was reversible error.

7. Thus *Robertson*, 32 F.3d at 411 approved this jury instruction:

Evidence has been introduced in this case on the subject of Occupational Safety and Health Administration (OSHA) standards, Environmental Protection Agency (EPA) standards, and National Institute of Safety and Health (NIOSH) standards, for the limited purpose of

### Melrose Park Building Code

■ Holland would also support his opinion by reference to the Melrose Park Building Code ("Code"), which incorporates by reference the 1990 BOCA National Building Code, a model written by the Building Officials & Code Administrators International ("BOCA"). Once again C & NW asserts that the FRA Policy Statement preempts the Code, at least insofar as it applies to the open pit at the Melrose Park Diesel Shop.

■ So long as the federal government acts within its constitutional authority (and neither party makes any assertion that either Congress or FRA has overstepped its own bounds), the government may under the Supremacy Clause preempt state or local laws to the extent such preemption is necessary to achieve governmental purposes (*DeHart v. Town of Austin*, 39 F.3d 718, 721 (7th Cir. 1994)). Preemption may be either by congressional statutes or by federal regulations promulgated pursuant to statutory authorization (*id.*, citing *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 368–69, 106 S.Ct. 1890, 1898–99, 90 L.Ed.2d 369 (1986)). There is, however, a presumption against federal preemption of state or local law (*Thiele v. Norfolk & W. Ry.*, 68 F.3d 179, 181 (7th Cir.1995)), particularly in fields traditionally occupied by the latter (*DeHart*, 39 F.3d at 722). Certainly building codes are such a field. Thus "preemption will not lie unless it is the 'clear and manifest purpose of Congress'" (*Thiele*, 68 F.3d at 181–82, quoting *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664, 113 S.Ct. 1732, 1737–38, 123 L.Ed.2d 387 (1993)).

Although neither litigant has pointed to it, there is statutory language that informs the instant analysis. Here is FRSA § 434 (emphasis added):

> The Congress declares that laws, rules, regulations, orders, and standards relating to railroad safety shall be nationally uniform to the extent practicable. *A State may adopt or continue in force any law, rule, regulation, order or standard relating to railroad safety until such time as the Secretary has adopted a rule, regulation, order, or standard covering the subject matter of such State requirement.* A State may adopt or continue in force an additional or more stringent law, rule, regulation, order or standard relating to railroad safety when necessary to eliminate or reduce an essentially local safety hazard, and when not incompatible with any Federal law, rule, regulation, order or standard, and when not creating an undue burden on interstate commerce.

So the issue is whether the Secretary of Transportation (or FRA as his designee) has "adopted a rule, regulation, order or standard covering the subject matter of the State requirement"—here the Building Code requirement that guards must be in place around open-sided walking surfaces (BOCA 803.6).

As already discussed, FRA has adopted no affirmative regulations as to inspection pits at railroad repair facilities—its only action has been to issue the Policy Statement that divests OSHA of regulatory authority. Clearly that alone is not enough to represent a preemptive provision "covering the subject matter of the State requirement." [8]

---

suggesting noise level guidelines. These standards are binding on certain industries in the United States. In those industries as to which the standards are binding, a violation of the standards, standing alone, constitutes negligence as a matter of law. These standards are not binding on defendant Burlington Northern in this lawsuit. The issue of negligence in this case must be determined by you based upon all the evidence submitted to you, and by applying the law as I have instructed you.

8. This is as good a time as any to point out that C & NW is not helped by the two cases it cites. *Missouri P.R. Co. v. Railroad Comm'n of Texas,* 948 F.2d 179, 184–86 (5th Cir.1991) is inapposite because it involves a situation where FRA had affirmatively issued a regulation that the district court reasonably found to have covered the field. And *Norfolk & W. Ry. v. P.U.C. of Ohio,* 727 F.Supp. 367 (S.D.Ohio 1990) misses the point made in the text. In deciding that FRA's Policy Statement was sufficient to invoke negative preemption, that case did not consider the important distinction between the preemption of one federal agency by another and the no more than inferable preemption of state or local law by federal regulations—a distinction underscored by Congress in FRA § 434.

First, even if it were assumed that the Policy Statement has the force of a "rule, regulation, order or standard,"[9] it is important to remember the context in which the Policy Statement was issued. By the Policy Statement's own language, it is intended only as FRA's take on the "relationship between the respective jurisdictions of FRA and OSHA" (43 Fed.Reg. at 10,584). That simply cannot be converted into a statement of FRA's intention to preempt all state and local regulations in the field. It is one thing for FRA to divest another federal agency of authority, but it is quite another for it to preempt state or local laws in a field traditionally regulated at the state or local level.[10]

Moreover, even on the added arguendo assumption that the Policy Statement applies more broadly than the FRA/OSHA relationship, the language of that Statement does not support C & NW's position. Consider the following caveat that preceded the "Walking–Working Surfaces" discussion in the Policy Statement (43 Fed.Reg. 10,587) (emphasis added):

> The following survey of OSHA standards is intended to aid the railroad industry in evaluating the breadth of FRA's exercised jurisdiction by contrasting the roles of FRA and OSHA. This discussion *cannot be regarded as definitive,* since considerable experience in adjusting the relationship of FRA and OSHA standards will likely be required before an optimum Federal regulatory program can be achieved. All statements concerning OSHA and FRA authority and the applicability of individual regulations *should be regarded as statements of general principle.*

In addition to buttressing the already-made point about the limited applicability of the Policy Statement, the equivocal language of that paragraph—particularly "cannot be regarded as definitive" and "should be regarded as statements of general principle"—is hardly a "clear and manifest" expression of intent to deprive state and local governments of all regulatory authority. Because neither Congress nor FRA has expressed a clear intent to preempt local regulations such as the Melrose Park Building Code, Holland will be allowed to ground his opinion in part on C & NW's noncompliance with the Code.

### ANSI Standards

■ Lastly, Holland also proposes to base his expert testimony in part on C & NW's compliance (or lack of compliance) with the national standards recommended by ANSI. Again C & NW maintains that the Policy Statement preempts the application of the ANSI standards.

That contention is badly misguided, for ANSI standards are nothing more than the learned *non-binding safety recommendations* of a private group.[11] Here is how ANSI describes its own standards (P.Mem. Ex. 1's Ex. A):

> An American National Standard implies a consensus of those substantially concerned with its scope and provisions. An American National Standard is intended as a guide to aid the manufacturer, the consumer, and the general public. The existence of an American National Standard does not in any respect preclude anyone, whether he has approved the standard or not, from manufacturing, marketing, purchasing, or using products, processes, or procedures not conforming to the standard. American National Standards are subject

---

**9.** There appears to be considerable force to the point, urged by the majority in *Conrail I* and by the dissenting Commissioner in *Conrail II,* that the Policy Statement has not faced the rigors of notice-and-comment rulemaking and thus lacks the force of law. But because the reasons set out in the text are sufficient to dispose of the present motion, this opinion need not tackle that issue.

**10.** *Missouri P.R. Co. v. Railroad Comm'n of Texas,* 833 F.2d 570, 576 n. 6 (5th Cir.1987) made this very point in distinguishing *Velasquez,* a case on which C & NW places heavy reliance:

> The sole issue in *Velasquez* was whether OSHA or FRA regulations applied to a walkway beside a track, for purposes of a personal injury action jury instruction. To hold as *Velasquez* did, that the FRA Policy Statement prevented plaintiff from securing an instruction on OSHA regulations, does not control the exercise of FRA jurisdiction to the exclusion of state regulation under § 434.

**11.** Insofar as ANSI standards are incorporated into the Melrose Park Building Code (see BOCA 3013.4), the applicable analysis is the one just set out in the preceding section of this opinion.

to periodic review and users are cautioned to obtain the latest editions.

So long as Miller's FELA theory is not wholly preempted by the actions of FRA— and C & NW already has lost that battle— surely Miller must be allowed to present expert testimony as to a privately issued, non-binding set of recommended standards. As before, C & NW will be free to cross-examine Holland and to offer its own testimony as to the appropriate standards of due care, but it cannot foreclose him from using the ANSI standards to bolster his own opinion.

### Conclusion

C & NW's motion in limine is denied in principal part. Holland will be allowed to cite in support of his expert testimony:

1. the standard of care that the OSHA regulations place on open pits generally;

2. C & NW's compliance or noncompliance with the Melrose Park Building Code; and

3. the standard of care that ANSI recommends for open pits.

Holland will not, however, be allowed to testify that the OSHA regulations apply as such to C & NW.