# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

Nos. 02-3751, 02-4058, 03-1481 & 03-2655

F. JOHN STARK III,

*Plaintiff-Appellant,*

v.

PPM AMERICA, INC., PPM HOLDINGS, INC., and the
AMENDED AND RESTATED PPM HOLDINGS, INC. CHANGE
OF CONTROL SEVERANCE PLAN, PLAN NO. 503,

*Defendants-Appellees.*

———————

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 01 C 1494—**William J. Hibbler**, *Judge.*

———————

ARGUED OCTOBER 27, 2003—DECIDED JANUARY 9, 2004

———————

Before RIPPLE, DIANE P. WOOD, and EVANS, *Circuit
Judges.*

EVANS, *Circuit Judge.* F. John Stark III filed this suit
seeking a substantial award under a "change of control"
provision in a benefits plan governed by the Employee
Retirement Income Security Act of 1974 (ERISA), 29 U.S.C.
§ 1001 *et seq.* He also sought what he sees as earned
compensation in the form of a bonus. The district court
granted summary judgment for the defendants and gave
them a sizeable attorney fees award of $261,529. Stark
appeals.

Stark began working for PPM America, Inc. (PPMA) in 1990 as vice-president and counsel. PPMA is part of an umbrella of multinational and diversified entities organized under the British holding company Prudential plc. PPM Holdings (PPMH) is the direct parent of PPMA and the sponsor of the ERISA plan at issue.

While at PPMA, Stark had the responsibility for managing the portfolio of Jackson National Life Insurance Company, an affiliate of PPMA and Prudential's United States insurance company. In January 2000, PPMA hired Lori Seegers as its general counsel and shifted Stark to the position of general counsel for PPMA's special investments. Throughout his time at PPMA, Stark reported to Russell Swanson, who was PPMA's president until November 2000, when Leandra Knes became president.

On December 5, 2000, Seegers and Knes met with Stark to tell him he had lost their trust and was being relieved of his job responsibilities. Knes presented Stark with a draft of a separation agreement which provided that his employment would continue until June 30, 2001, that he would be paid his base salary of $307,000 per year, and after his departure he would receive a lump sum payment of $500,000 but no bonuses for the years 2000 and 2001. Two weeks later, the offer was withdrawn because of the discovery of alleged misconduct by Stark. On January 5, 2001, Stark notified Knes that he believed his employment with PPMA had been constructively terminated.

Stark retained attorneys who negotiated with PPMA, but his demands were not met. Rather than proceeding through the administrative process for filing a claim, Stark filed this action in the United States District Court for the Northern District of Illinois, contending that he was entitled to severance pay and a bonus under the PPMH change of control severance plan. He says his failure to exhaust his administrative remedies must be excused because it would have been futile to go that route.

The district court denied Stark's motion for summary judgment in which he argued that exhaustion would be futile. In the same order, the district court granted the defendants' motion for summary judgment, finding that there was no basis for severance pay or a bonus. Following that order, Stark filed a motion for clarification in which he, as defendants put it, "proposed an absurdity." He argued that the district court was powerless to reach the merits on his claim because he had failed to exhaust his administrative remedies. He asked the judge to send the case back to the plan administrator for the exhaustion of administrative remedies. Confronted with this about-face, the judge then issued an order saying that the failure to exhaust was excused because "the record clearly establishes that plaintiff cannot prevail on his benefits claim." We review the district court's grant of summary judgment *de novo. See Thiele v. Norfolk & W. Ry. Co.*, 68 F.3d 179, 181 (7th Cir. 1995).

At the outset, we mention briefly that there is considerable doubt whether the change of control severance plan is applicable in the circumstances before us. It is, as the name implies, only applicable if there is, in fact, a change in control of the employer-company. Stark relies on a provision in the plan which says that a change of control occurs if the ultimate parent (in this case Prudential plc) sells 50 percent of the stock or assets of an employer (i.e., a subsidiary). In December 1999, Prudential plc restructured its subsidiaries. Before the restructuring, PPMH was a wholly owned subsidiary of Prudential Portfolio Managers Ltd. (PPML). In 1999, PPML transferred its stock in PPMH to Prudential plc, which then transferred the shares down to other existing Prudential plc entities: Prudential One Limited, Prudential Two Limited, and Prudential Three Limited. Then PPMH shares were transferred to Holborn Delaware Partnership, in which Prudential One, Prudential Two, and Prudential Three were partners. Finally, on

March 31, 2000, PPMH shares were transferred to Brooke Holdings, Inc. which wholly owns Holborn Delaware. Stark contends that these transfers constitute a change of control as set out in the plan.

Stark recognizes that an exclusion to the pertinent provision of the plan says there is no change of control under these circumstances if the ultimate parent retains direct control of the business. However, using the definitions in the plan, which may arguably contemplate ownership by corporations only, Stark contends that, for purposes of the plan, the exclusion does not apply because the chain of control was broken when partnerships rather than corporations entered the ownership chain. We are skeptical about this argument, but we will assume the plan applies and proceed to the more basic issue of exhaustion of administrative remedies.

Despite the fact that the change of control severance plan is very clear that exhaustion is required, Stark failed to proceed through administrative process. Appendix B to the plan, titled "Administration," sets out the procedures for handling claims. Paragraph 2 provides for a committee which has the power "to compute or cause to be computed the amount of benefits which shall be payable to any person in accordance with the provisions of the Plan[.]" Furthermore, under paragraph 4, the committee has the "sole discretion" to determine, among other things, eligibility for benefits under the plan. However, this section also says that the decisions of the committee "shall not be entitled to any presumptive validity and, in the event of any dispute between any Employer and a Participant, be subject to de novo review by a court." Although a participant can receive *de novo* review of a committee decision in court, there are some steps he must take first. Paragraph 14 states clearly that the claimant must submit a claim for benefits to the plan administrator. Paragraph 15 provides for the review by the committee of the plan administrator's denial of a

claim. Prior to taking those steps, the participant "shall have no right to seek review of a denial of benefits, or to bring any action in any court to enforce a Claim, prior to his filing a Claim and exhausting his rights to review . . . ." If the claimant does not request review by the committee, he "shall have no right to obtain such a review or to bring an action in any court and the denial of the Claim shall become final and binding on all Persons for all purposes." Although the plan requires exhaustion prior to filing a lawsuit, it also provides for *de novo* review in court. The claimant has nothing to lose and everything to gain by using the procedures.

Exhaustion of plan remedies is favored because "the plan's own review process may resolve a certain number of disputes; the facts and the administrator's interpretation of the plan may be clarified for the purposes of subsequent judicial review; and an exhaustion requirement encourages private resolution of internal employment disputes." *Ames v. American Nat'l Can Co.*, 170 F.3d 751, 756 (7th Cir. 1999). However, it is also true that we have recognized two circumstances in which a failure to exhaust may be excused. One is if there is a lack of meaningful access to review procedures, and the other applies if pursuing internal remedies would be futile. *Robyns v. Reliance Standard Life Ins. Co.*, 130 F.3d 1231 (7th Cir. 1997). The decision to require exhaustion before a plaintiff may proceed with a federal lawsuit is a matter within the discretion of the trial court. We will disturb a district court's decision "only when there has been a clear abuse of discretion." *Powell v. A.T.&T. Communications, Inc.*, 938 F.2d 823, 825 (7th Cir. 1991).

Stark claims that pursuing the internal remedies would be futile in his situation because the person who terminated him, Knes, would have participated in the ultimate decision. He also points out that the settlement negotiations were unsuccessful and the defendants have taken the

position in this litigation that he is not entitled to benefits. But if claimants were allowed to skip the administrative procedure, it is hard to imagine that these factors would not be present in almost all cases. Once battle is joined, positions calcify.

Given the elaborate exhaustion requirements in the severance plan and the rather complex provisions in the plan regarding when a change of control occurs, we find this to be a situation particularly well-suited for private resolution of the dispute. There is no evidence that either the plan administrator or the committee would have failed to fulfill their duty to consider his claim. There also is no evidence that Knes, in her capacity as a member of the committee, would not have fairly considered Stark's request for benefits. We noted in *Ames* how bizarre it would be to find that a plan's "price for prevailing on the exhaustion argument is that it is estopped from urging the interpretation of the plan that it believes is correct." At 756. Put otherwise, when a claimant ignores the administrative remedies and proceeds directly to federal court, he cannot be allowed to justify his choice by the fact that the plan defended itself in the lawsuit. In short, we find no reason to waive the exhaustion requirement. This is one of those rare cases in which waiver of the exhaustion requirement was an abuse of discretion. At this point, the proper remedy is dismissal of the case. Stark cannot be allowed to skip the administrative procedure, cause the defendants to incur litigation costs, and then, after losing, be allowed to exhaust his remedies. We, therefore, affirm the district court's judgment dismissing the claim for severance benefits on the alternate basis that Stark did not exhaust his administrative remedies.

Stark also argues that he is entitled to a bonus. He says the plan mandated a bonus. But his failure to exhaust the plan procedures precludes our consideration of this claim under that theory. He also says that he has a claim under

the Illinois Wage Payment and Collection Act (IWPCA). 820 ILCS 115/1 *et seq.* But he did not assert this claim in his complaint, despite amending it twice. More importantly, the IWPCA requires a right to compensation pursuant to an employment contract or agreement. 820 ILCS 115/2. Stark has no employment contract setting out the terms of his bonus. He claims that past practice constitutes a contract. However, like the plaintiff in *Brines v. XTRA Corp.*, 304 F.3d 699 (7th Cir. 2002), what Stark is trying to do is to use the employer's practice "not to explicate a contract but to create one." At 703.

Stark also relies on a theory of promissory estoppel. He says it was well-understood that a bonus was part of the compensation package and, furthermore, he received his full bonus or an almost full bonus every year. The defendants say that bonuses were discretionary, that other employees who left PPMA for poor performance did not receive a bonus, that Stark himself exercised discretion in recommending bonuses for his subordinates, that he participated in discussions with senior management in which the discretionary nature of bonuses was confirmed, and that Stark told job applicants that there was no guaranteed bonus. The undisputed facts show that bonuses, as the name implies, were not guaranteed. In *Brines*, we compared severance pay with bonuses and said that "[t]he normal understanding of severance pay (when not provided for in a written plan), as of bonuses, is that it is at the discretion of the employer; there is nothing here to upset that understanding." At 704. Neither is there anything in the case before us to upset the normal understanding of a bonus.

Finally, Stark appeals the award of attorney fees to the defendants. Under ERISA's fee-shifting statute, 29 U.S.C. § 1132(g)(1), a district court may, in its discretion, "allow a reasonable attorney's fee and costs of action to either party." Under ERISA, "there is a 'modest presumption' in

favor of awarding fees to the prevailing party, but that presumption may be rebutted." *Senese v. Chicago Area I.B. of T. Pension Fund*, 237 F.3d 819, 826 (7th Cir. 2001). Although we have articulated two tests for analyzing the propriety of a fee request, *Quinn v. Blue Cross and Blue Shield Ass'n*, 161 F.3d 472, 478 (7th Cir. 1998), both formulas essentially ask the same question, i.e., "was the losing party's position substantially justified and taken in good faith, or was that party simply out to harass its opponent?" *Bowerman v. Wal-Mart Stores, Inc.*, 226 F.3d 574, 593 (7th Cir. 2000) (citation omitted). In other words, because ERISA's remedial purpose is to protect, rather than penalize participants who seek to enforce their statutory rights, an award of fees to a successful defendant will be denied "if the plaintiff's position was both 'substantially justified'—meaning something more than nonfrivolous, but something less than meritorious—and taken in good faith, or if special circumstances make an award unjust." *Senese*, 237 F.3d at 826.

The district judge awarded fees based on a number of factors. He found that Stark made no effort to recover benefits under the plan's internal remedies. Furthermore, he found that Stark was evasive—his theories kept shifting, and he was unable at the time he claimed benefits to show that a change of control under the plan occurred. The judge also rejected Stark's claims of poverty—i.e., the inability to pay the fees. The judge's conclusion was that Stark's pursuit of benefits was not substantially justified so an award of attorney fees was proper.

In this case, the district judge did not abuse his discretion when he concluded that Stark's position was not "substantially justified." He in fact made no attempt to exhaust his plan remedies by following the claims procedures it requires. Then, when the defendants' motion for summary judgment was granted, Stark argued that the order should be set aside so he could exhaust his plan remedies, certainly

a strange request from one who proclaimed loudly that exhaustion would be futile.

Then there is the issue of "which change of control." It took Stark a good deal of time to settle on a basis for his claim for benefits. During the period from December 2000 to March 2001, he and his employer engaged in settlement negotiations, but during that period, Stark did not request benefits based on a change of control as defined in the plan. When his lawsuit was filed in March 2001, he still had not identified a specific change of control which would trigger benefits. At one point, he relied on a proposed merger of Prudential and American General Corporation. This merger did not happen, and Stark changed his theory. He looked back 2 years to settle on the restructuring of the Prudential companies we discussed earlier as a basis for his claim.

Nor was it an abuse of discretion to conclude that Stark was able to pay a fee award, even though he argued vigorously that he was not. He argued the point, but he did not submit documentation such as tax returns, W-2 statements, or bank statements which would have supported his argument. Regarding Stark's ability to pay, certain facts can be gleaned from the record. His annual salary at PPMA was over $300,000 per year; prior to 2000, he received approximately two and a half times his salary as an annual bonus. He remains an investor in several funds managed by PPMA. In fact, in December 2000, he received a payment of $711,000 on funds managed by PPMA. The district judge was not way off base when he found that Stark failed to establish that his financial situation was a special circumstance protecting him from an order to pay fees.

Which brings us to the amount of the fee award. The defendants requested a total of $493,470 in attorney fees. They were awarded $261,529. The issue before us is whether the award was reasonable. Stark, of course, thinks

it was too much; the defendants think it was too little—though they did not appeal the issue. We find that it was reasonable.

As required, the district judge calculated the "lodestar"; that is, the product of an attorney's reasonable hourly rate and the number of hours reasonably expended. *See Hensley v. Eckerhart*, 461 U.S. 424 (1983); *Mathur v. Bd. of Tr. of S. Ill. Univ.*, 317 F.3d 738 (7th Cir. 2003). Hours spent are not reasonably expended if they are excessive, redundant, or otherwise unnecessary. Further, the hours claimed can be reduced by the number of hours spent litigating claims on which the party did not succeed to the extent they were distinct from claims on which the party did succeed. *Spegon v. Catholic Bishop of Chicago*, 175 F.3d 544 (7th Cir. 1999).

The district judge calculated the lodestar to include the time the defendants' attorneys spent on the issue after Stark identified the change of control on which he was relying. We see no reason this time should not have been included. The judge also rejected a number of the plaintiff's other objections, such as his objection to an award of fees for drafting motions for attorney fees and the time spent on post-judgment motions. Like the district judge, we see no reason to exclude those hours. Stark also objected to the request for travel time for out-of-town attorneys. However, inclusion of that time was proper; travel time and expenses are compensable. *Maurice v. Kozel*, 69 F.3d 830 (7th Cir. 1995). The district judge did, however, properly reduce the defendants' fee request by 20 percent for time spent defending claims which were not ERISA claims.

Stark also contended in the district court that the fee request must be reduced to reflect the defendants' level of success. Ironically, he argues that the defendants did not prevail on their exhaustion of remedies defense. Of course, now they have. But that aside, the exhaustion of remedies

defense was but one of the paths which could lead to the defendants' ultimate victory.

We also note that the district judge, on his own, reviewed the request for fees with an eye toward eliminating hours that were excessive, duplicative, or unnecessary. Because so many entries on the fee request were particularly vague, the judge reduced the hours by 30 percent, or 425 hours. This review was accomplished without significant help from Stark, and the district judge's care should be commended.

Next is the issue of whether the hourly rate found by the district judge is reasonable. An attorney's market rate is the rate that lawyers of similar ability and experience in the community normally charge their paying clients for the kind of work in question. *People Who Care v. Rockford Bd. Of Educ., Sch. Dist. No. 205*, 90 F.3d 1307 (7th Cir. 1996). The burden of proving the market rate is on the applicant. *McNabola v. Chicago Transit Auth.*, 10 F.3d 501 (7th Cir. 1993); however, once the attorney provides evidence of the market rate, the burden shifts to the opposing party to show why a lower rate should be awarded. In this case, the defendants presented affidavits from attorneys in the law firms involved in this case regarding their rates. The district judge found the submissions self-serving and "precipitously close to being insufficient." The defendants were saved on this issue by statements by the defendant-companies that they paid their attorneys in full for the services rendered and by Stark's failure to adequately contest the issue. We have previously stated that the best evidence of the market value of legal services is what people will pay for it. *Balcor Real Estate Holding, Inc. v. Walentas-Phoenix Corp.*, 73 F.3d 150 (7th Cir. 1996). We cannot fault the district judge's conclusion that the rates were reasonable. We therefore find that the district judge did not abuse his discretion in awarding attorney fees and setting the amount at $261,529.

The judgment of the district court is AFFIRMED.

A true Copy:

Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*