**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**Filed 7/5/96**

**TENTH CIRCUIT**

_____

NANCY ARMIJO, personal representative of the Estate of Luz Armijo, deceased,

      Plaintiff-Appellant,

v.                     No. 95-2114

ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY,

      Defendant-Appellee.

_____

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. No. CIV-89-293-JC)**

_____

Chris S. Key, Albuquerque, New Mexico, for Plaintiff-Appellant.

John S. Thal, Atkinson & Thal, P.C. (Timothy C. Holm and Donald A. DeCandia, Modrall, Sperling, Roehl, Harris & Sisk, P.A. with him on the brief), Albuquerque, New Mexico, for Defendant-Appellee.

_____

Before **BALDOCK, BRORBY** and **EBEL**, Circuit Judges.

_____

**BRORBY**, Circuit Judge.

_____

On October 23, 1987, Luz Armijo was killed when his vehicle collided with a train operated by the Atchison, Topeka and Santa Fe Railway Co. (hereafter "Santa Fe") at the North Gabaldon crossing in Valencia County, New Mexico. Acting as the personal representative for her husband's

estate, Nancy Armijo brought this action for wrongful death and punitive damages under New Mexico law, alleging Santa Fe negligently or recklessly failed to provide adequate warnings at the North Gabaldon crossing and negligently operated the train that collided with Mr. Armijo. The district court granted partial summary judgment in favor of Santa Fe on Ms. Armijo's negligent failure to warn claim on the ground that claim is preempted by federal law, *Armijo v. Atchison, Topeka & Santa Fe Ry. Co.*, 754 F. Supp. 1526, 1528-34 (D.N.M. 1990), and certified its decision as final pursuant to Fed. R. Civ. P. 54(b).

We reversed the grant of partial summary judgment and held, as a matter of law, that Ms. Armijo's failure to warn claim was not preempted. *Armijo v. Atchison, Topeka & Santa Fe Ry. Co.*, 19 F.3d 547 (10th Cir. 1994) (*Armijo I*). We later granted Santa Fe's petition for rehearing and revisited *Armijo I*. In the order on rehearing, we concluded that, as a matter of fairness, Santa Fe should be allowed to further develop the evidence bearing on the preemption issue in light of the Supreme Court's decision in *CSX Transportation, Inc. v. Easterwood*, 507 U.S. 658 (1993), and our decision in *Hatfield v. Burlington N. R.R. Co.*, 1 F.3d 1071 (10th Cir. 1993) (*Hatfield I*), both decided after the district court issued its ruling. *Armijo v. Atchison, Topeka & Santa Fe Ry. Co.*, 27 F.3d 481 (10th Cir. 1994) (*Armijo II*).

Upon remand, Santa Fe renewed its motion for partial summary judgment and submitted additional evidence. The district court again granted summary judgment[1] on Ms. Armijo's claim

---

[1] In its letter ruling, the district court commended counsel for both parties for "the excellent argument [they] presented at the hearing" on Santa Fe's motion for partial summary judgment. We too commend counsel on their candor and skill in addressing the challenging issues presented in this appeal.

2

Santa Fe negligently failed to provide adequate warning devices at the North Gabaldon crossing. Ms. Armijo then dismissed her remaining claims for compensatory damages with prejudice, and the district court entered final judgment in favor of Santa Fe. This appeal followed.

## I

Ms. Armijo contends the district court erred in concluding her state law failure to warn claims are preempted. In *Easterwood*, the Supreme Court considered whether certain regulations issued by the Secretary of Transportation pursuant to the Federal Railroad Safety Act of 1970, as amended, 45 U.S.C. § 434, preempt state law claims against a railroad, alleging the railroad acted negligently failing to erect and maintain adequate warning devices at a railroad grade crossing.[2] The regulations in question require the states to "develop and implement, on a continuing basis, a highway safety improvement program which has the overall objective of reducing the number and severity of accidents and decreasing the potential for accidents on all highways." 23 C.F.R. 924.5 (1995). As part of the program, the states are to establish priorities for addressing all manner of highway hazards, including railroad grade crossings. 23 C.F.R. § 924.9(a)(4) (1995). For all railroad grade crossings, the regulations require the states to use warning devices conforming with the Federal Highway Administration Manual on Uniform Traffic Control Devices for Streets and Highways (hereafter "the Manual"). 23 C.F.R. §§ 646.214(b)(1) and 655.603 (1995). However,

---

[2] Congress has repealed 45 U.S.C. § 434. Pub. L. 103-272, § 7(b), July 5, 1994, 108 Stat. 1379, 1386. The repeal has no impact on this case, however. *Id.*, 108 Stat. 1379 (repeal has no effect on "proceedings that were begun before the date of the enactment" of Pub. L. 103-272, July 5, 1994).

"*Adequate warning devices* ... on any project where Federal-aid funds participate in the installation of the devices are to include automatic gates with flashing light signals" under certain circumstances, 23 C.F.R. § 646.214(b)(3)(i) (1995) (emphasis in original), or, if such devices are not required under the regulations, "the type of warning device to be installed, whether the determination is made by a State regulatory agency, State highway agency, and/or the railroad, is subject to the approval of FHWA." 23 C.F.R. § 646.214(b)(4) (1995).

The Supreme Court held § 924 and the requirement the states comply with the Manual do not preempt state law failure to warn claims. *Easterwood*, 507 U.S. at 668-70. The Court held, however, that when §§ 646.214(b)(3) and (4) apply, state tort law is preempted, because these regulations "displace state and private decisionmaking authority by establishing a federal-law requirement that certain protective devices be installed or federal approval obtained." *Easterwood*, 507 U.S. at 670. These sections apply whenever "federal funds participate in the installation of the [warning] devices." *Id.* (footnote omitted). We further refined the *Easterwood* analysis in *Hatfield v. Burlington N. R.R. Co.*, 64 F.3d 559 (10th Cir. 1995) (*Hatfield II*), by clarifying the type of federal participation required to trigger preemption. We reiterated our conclusion in *Hatfield I* that there must be "significant" federal participation, which requires "'more than a casual financial connection' between the federal government and the project." *Hatfield II*, 64 F.3d at 561 (quoting *Hatfield I*, 1 F.3d at 1072). We noted, however, that in *Hatfield I* "we also made it clear that federal financial participation may include utilization of non-cash resources, such as federally funded personnel resources, and that federal participation may occur at any point in the project, including the planning stage." *Id.* We further explained we must look at the "crossing project broadly -- from its planning

4

inception to its construction completion -- in determining when significant federal participation first occurred." *Id.*

In *Hatfield II,* we held federal preemption was triggered in early 1985, at which time $619.17 in federal funds had been spent on preliminary engineering, federally mandated active warning devices had been selected pursuant to 23 C.F.R. § 646.214(b)(3), and the crossing was scheduled for installation of federally funded active warning devices. *Id.* We rejected the contention that the proportionality of the federal funds to the overall cost of the project is "the sole touch-stone in determining the significance of a federal financial commitment." *Hatfield II*, 64 F.3d at 562.

> Instead, we believe that the financial commitment must be such that it shows a clear federal intent to require a federally approved warning device at the crossing in question, backed up by the actual expenditure of federal resources of more than a casual or de minimis nature, and specifically directed toward the ultimate installation of the improved warning devices at that crossing.

*Id.* At the moment the federal government manifests such intent, the "financing of the improvement project and its direction and control" are removed from the railroad, and claims against the railroad relating to the adequacy of the warnings are preempted. *Id.*

In light of *Easterwood*, *Hatfield II*, and our other post-*Easterwood* decisions, the issue in this case is whether federal funds participated in some significant way in the installation of warning devices at the North Gabaldon crossing before October 23, 1987, the date of the accident. Our review of the record shows federal participation began, and New Mexico law was preempted, no later than January 25, 1983. On that date, the Secretary of Transportation agreed to provide ninety percent of the funds required to install reflectorized crossbucks at a number of railroad grade

crossings in New Mexico, including the North Gabaldon crossing. At this point, the North Gabaldon crossing became a "project where Federal-aid funds participate in the installation of [warning] devices," 23 C.F.R. § 646.214(b)(3)(i), and the type of warning device used was under the control of the Secretary of Transportation. The Secretary of Transportation's authorization of passive warning devices was tantamount to a determination, pursuant to 23 C.F.R. § 646.214(b)(4), that only passive, rather than active, warning devices were sufficient, and that determination took the matter out of New Mexico's and Santa Fe's hands.

Ms. Armijo draws our attention to the Seventh Circuit's decision in *Shots v. CSX Transp. Inc.*, 38 F.3d 304 (7th Cir. 1994), which reached the opposite conclusion on facts very similar to those in this case. Mr. Shots was injured at a railroad grade crossing in Indiana in 1989. *Id.* at 305. At the time of the accident, the crossing was equipped only with reflectorized crossbucks. *Id.* In 1975, the state of Indiana and the railroad entered into an agreement to "'upgrade the passive protection at the Railroad's public rail-highway crossings in Indiana to minimum standards, as established by the State'" by installing reflectorized crossbucks at a number of crossings, including the crossing where Mr. Shots was injured. *Id.* at 306. The Secretary of Transportation approved the project five days after 23 C.F.R. § 646.214 became effective and provided federal funding, but did not receive a report from a diagnostic team regarding the type of warning systems required at each crossing under that regulation. *Id.* The Seventh Circuit acknowledged that if the Secretary of Transportation's approval and funding of the project could be interpreted as an express determination that the reflectorized crossbucks were sufficient under 23 C.F.R. § 646.214(b)(4), Mr. Shots' claim would be preempted. *Id.* at 308. The Seventh Circuit concluded, however, Mr. Shots' state law

6

claims were not preempted. *Id.* at 309. The court explained:

> The [1975] agreement does not state or imply that the thousands of crossings covered by it would be adequately safe if equipped with reflectorized cross-bucks. The point is rather that these are the only form of safety device that the agreement covers. This limitation of scope is reinforced by the fact that the agreement is explicitly limited to providing the "minimum" in passive protections -- the minimum being standard reflectorized cross-bucks for crossings, such as the one in question in this case, that lacked even that much in the way of a warning device. Minimum is not a synonym for optimum, or even adequate. We must not forget the context of the agreement. The State of Indiana had thousands of substandard crossings, and limited funds, even with federal largesse, to bring them all up to the optimal standard of safety. The task was to maximize grade-crossing safety in the state as a whole, subject to a budget constraint, so it was to be expected that adequate safety might be sacrificed at some crossings to enable minimum safety to be achieved at all. So far as can be gathered from the record compiled in the district court, the agreement was a step on the road to adequate safety rather than a determination by the State of Indiana or the federal Secretary of Transportation as to what safety devices would be adequate at each of the thousands of crossings covered by it.

> Thus we do not think it can be realistically said, to use the formulation in *Easterwood*, that "the Secretary has determined the devices to be installed" at these crossings merely because he authorized federal funds to bring them up to minimum standards, utilizing passive warning devices solely. Indeed, it would have been an extraordinary act of irresponsibility for the Secretary of Transportation, by approving the agreement, to preclude tort liability for the railroad's failing to have active warning devices at any of the thousands of crossings covered by the agreement, or otherwise to prevent the state from requiring adequate safety devices at the busiest or most dangerous of these crossings, when no one in the federal government had made a determination that the improvements to be made would bring all the crossings up to a level of safety adequate to satisfy federal standards.

*Id.* at 308-09.

Ms. Armijo contends, and we agree, that the Seventh Circuit's analysis in *Shots* arguably supports her position the Secretary of Transportation's approval and funding of the 1983-1984 crossbuck project did not trigger preemption. It is undisputed that the purpose of the project was to

7

bring a large number of railroad grade crossings into compliance with the requirements of the Manual, and that the Secretary of Transportation's approval of the project was not the result of an express administrative finding pursuant to 23 C.F.R. § 646.214(b)(4) that only passive, rather than active warning systems were required at the crossings in question. It is only an academic question whether Ms. Armijo would fare better under *Shots*, however, because we join the Fifth and Eighth Circuits in declining to follow that decision. *See Elrod v. Burlington N. R.R. Co.*, 68 F.3d 241, 244 (8th Cir. 1995); *Hester v. CSX Transportation, Inc.*, 61 F.3d 382, 387 & n.9 (5th Cir. 1995), *cert. denied*, 116 S. Ct. 815 (1996). In *Hester*, the Fifth Circuit stated, and we agree, that "[t]he fact that federal funds participated in the installation of the warning devices legally presupposes that the Secretary approved and authorized the expenditure, which in turn legally presupposes that the Secretary determined that the safety devices installed were adequate to their task." *Hester*, 61 F.3d at 387. In the absence of clear evidence showing that, at the time the Secretary of Transportation approved the crossbuck project in 1982, the Secretary had concluded the crossbucks, though desirable, were not adequate in themselves to warn the public of the danger at the North Gabaldon crossing, we assume the Secretary of Transportation made a finding the crossbucks were adequate under 23 C.F.R. § 646.214(b)(4), and we will not delve into the question of whether that finding was wise or well informed.

Finally, Ms. Armijo makes much of the fact that in 1984, after the crossbuck project was complete, the New Mexico Railroad Safety Program Diagnostic Team (hereafter "the Diagnostic Team") placed the North Gabaldon crossing on a list of twenty-two railroad grade crossings requiring federally funded installation of active warning systems once funds became available.

(App. 60.)  She also notes one of the members of the Diagnostic Team was Douglas Bennett, a United States Department of Transportation engineer, and that Mr. Bennett signed an affidavit stating his signature on the Diagnostic Team's report "represented the [Secretary of Transportation]'s approval of the recommendations" contained in that report.  Ostensibly, Ms. Armijo would have us hold that even if the Secretary of Transportation's initial determination (that passive warning systems were active at the North Gabaldon crossing as of early 1982) preempted state law, the subsequent decision (that an active warning system was needed as of 1984) somehow suspended the preemption of state law until federal funds participated in some significant way in the installation of the active warning devices.  We decline to so hold.  The fundamental issue under both *Easterwood* and our post-*Easterwood* decisions is whether the federal government has "displace[d] state and private decisionmaking authority by establishing a federal-law requirement that certain protective devices be installed or federal approval obtained" and "effectively set the terms under which railroads are to participate in the improvement of crossings."  *Easterwood*, 507 U.S. at 670; *see Hatfield II*, 64 F.3d at 562.  The mere fact that the federal government has changed its opinion regarding what warning devices are needed at a particular crossing at some point after making a prior determination a lesser warning system is sufficient is of no real significance:  the issue is not *what* warning system the federal government determines to be necessary, but whether the *final authority to decide* what warning system is needed has been taken out of the railroad's and the state's hands under 23 C.F.R. § 646.214(b)(3) & (4).  The only situation we can envision in which preemption could arguably be considered suspended or terminated would be where the Secretarty of Transportation does not merely change his or her view regarding the type of warning system needed, but affirmatively abandons the project and either withdraws federal funding or allows previously allocated funding to be used at

9

another site, which did not occur in this case. *See Easterwood*, 507 U.S. at 673 (no preemption in part because city "scotched" plans to build warning gate at the Cook Street, federal funds earmarked for the projected were transferred to other projects, and "[t]he decision to install gate arms at the Cook Street crossing was placed on a list of projects to be considered at a later time").

## II

For the reasons stated, the judgment of the district court is **AFFIRMED**.

95-2114, Armijo v. Atchison, Topeka & Santa Fe

**EBEL**, Circuit Judge, **dissenting**.


I agree that preemption initially occurred at the time the federal government significantly participated in the installation of reflectorized crossbucks.[1] However, I diverge from the majority's conclusion reached in the last lengthy paragraph of the opinion that preemption continued past 1984, when the diagnostic team decided automatic gates were needed at the North Gabaldon crossing. Instead, I agree with Armijo that the decision to install automatic gates removed the preemptive effect of the crossbucks' installation and, therefore, Armijo's claims were not preempted at the time of her husband's 1987 accident. I therefore respectfully dissent.

My disagreement with the majority concerns whether preemption was in place at the time of the accident in 1987. In <u>CSX Transp., Inc. v. Easterwood</u>, 507 U.S. 658 (1993), the Supreme Court held that preemption applies when the preconditions for the application of either section (b)(3) or section (b)(4) have been met. 507 U.S. at 670-72. Looking at these regulations as applied to the

---

[1] Although I agree with the majority that preemption occurred as a result of the federal government's participation in the installation of reflectorized crossbucks, I disagree with some of the language in the majority opinion concerning the time when such preemption first arose. The majority opinion concludes that preemption occurred, at the latest, on January 25, 1983, the date on which the Secretary of Transportation agreed to provide ninety percent of the funds required to install reflectorized crossbucks. However, we held in <u>Hatfield v. Burlington N. R.R. Co.</u>, 64 F.3d 559, 562 (10th Cir. 1995) ("<u>Hatfield II</u>"), that preemption takes place when the federal government: (1) commits itself through a significant event or events, to a project to install active warning devices; and (2) expends significant federal resources on the project. Therefore, it is insufficient under the second prong of the <u>Hatfield II</u> test merely to <u>authorize</u> that federal funds be spent on upgrading a crossing; instead <u>Hatfield II</u> requires "<u>the actual expenditure</u> of federal resources of more than a casual or de minimis nature" before preemption occurs. <u>Id.</u> (emphasis added.) <u>See</u> <u>United States v. Zapata</u>, 997 F.2d 751, 759 n.6 (10th Cir. 1993) (noting that a three-judge panel of the court cannot overturn an earlier opinion from the same court). Nevertheless, that date is not critical in this case because here it is clear that the federal government had reimbursed the state for the cost of engineering or installing the reflectorized crossbucks. Therefore, prior to the time of this accident the federal government's participation was significant enough to trigger preemption under 23 C.F.R § 646.214(b)(4).

North Gabaldon crossing at the time of the accident, the preconditions for section (b)(4) no longer were met in 1987. The regulation addressing section (b)(4) provides:

> For crossings where the requirements of § 646.214(b)(3) are not applicable, the type of warning device to be installed, whether the determination is made by a State regulatory agency, State highway agency, and/or the railroad, is subject to the approval of FHWA.

23 C.F.R. § 646.214(b)(4) (emphasis added). Thus, a railroad may invoke preemption under section (b)(4) only so long as "the requirements of § 646.214(b)(3) are not applicable" to the particular crossing in question. One requirement of section (b)(3) is that a "diagnostic team recommends" automatic gates. See 23 C.F.R. § 646.214(b)(3)(I)(F). It is undisputed that in 1984 a diagnostic team recommended that automatic gates be installed at the North Gabaldon crossing. Therefore, although section (b)(4) at one time operated to preempt state claims because of the government's significant participation in the installation of reflectorized crossbucks, this preemption ceased in 1984 once a diagnostic team recommended automatic gates.

The majority concludes that the diagnostic team's 1984 recommendation of automatic gates did not remove the crossbucks' preemptive effect because the Secretary of Transportation did not affirmatively abandon the crossbucks project and either withdraw federal funding or allow previously allocated funding to be used at another site. No case law requires such an affirmative withdrawal, and I believe that such a requirement is in conflict with the plain language of sections (b)(3) and (b)(4). Rather, I believe that the regulations recognize that as conditions surrounding a particular crossing change and make the crossing more dangerous to motorists, a determination that passive warning devices are sufficient to protect motorists in one year should not continue to preempt state claims when it is determined the passive devices provide insufficient warning in a later year. Also,

considering the "presumption against preemption" applied by the Supreme Court in Easterwood, 507 U.S. at 667-68, I believe that we must conclude that neither section (b)(3) nor section (b)(4) operated to preempt Armijo's claims at the time of the accident.[2]  Accordingly, I would reverse the decision of the district court and remand this action for further proceedings.

---

[2]  I do not believe that preemption occurred under section (b)(3) at the time of the accident because in 1987, the federal government had not committed itself significantly to the installation of automatic gates at the North Gabaldon crossing.  Instead, federal participation was limited to a single federal employee participating on a diagnostic team which selected 22 crossings requiring warning signal upgrades during the next five years.  In contrast with Hatfield II, no engineering study had been performed at the crossing until after the accident occurred.  Also, the second element of the Hatfield II test was not met at the time of the accident.  The federal resources expended here were limited to the sole federal employee participating on the diagnostic team. Although Santa Fe estimates that the federal government spent $1,250 on the engineer's salary while he served on the diagnostic team, this amount must be apportioned among the 22 crossings he considered in detail, as well as more than 100 crossings he considered on an original list of crossings.