David Ray TREVINO, et al., Appellants,

v.

The ATCHISON, TOPEKA & SANTA FE
RAILWAY COMPANY, Appellee.

No. 14–95–00785–CV.

Court of Appeals of Texas,
Houston (14th Dist.).

Aug. 7, 1997.

Rehearing Overruled Jan. 22, 1998.

Rex L. Easley, Victoria, Richard P. Hogan, Houston, for appellants.

H. Daniel Spain, Timothy H. Pletcher, J. Patrick Coulson, Houston, Frederick J. Bradford, Kenneth J. Bower, Galveston, William R. Floyd, Houston, for appellees.

Before LEE, AMIDEI and EDELMAN, JJ.

## PLURALITY OPINION
## ON REHEARING

AMIDEI, Justice.

Appellants' motion for rehearing is granted, the majority and dissenting opinions issued in this case on March 13, 1997 are

withdrawn and the following opinion is issued in their place.

This is an appeal from an order granting summary judgment in favor of appellee, Atchison, Topeka & Santa Fe Railway Company ("Santa Fe"). In one point of error, appellants contend the summary judgment was improperly granted. We reverse and remand.

## FACTS AND PROCEDURAL STATUS

On September 11, 1992, Erica Trevino and her children, David Ray Trevino, Jr. and Vallerie Trevino, were killed after their car collided with a train at the 16th Street crossing in Abernathy, Texas. Anthony Trevino, also Ms. Trevino's child, suffered severe brain damage as a result of the collision. Santa Fe owned the tracks where the incident occurred.

In February 1993, appellants[1] instituted this wrongful death action against Santa Fe under Texas law, alleging: (1) negligent failure to install adequate warning devices at the 16th Street crossing; and (2) negligent failure to warn persons that the train was approaching or passing over the crossing. Santa Fe moved for summary judgment, and the trial court granted summary judgment in its favor. This appeal follows.

## STANDARD OF REVIEW

The standard we follow in reviewing a summary judgment is well established. The movant for summary judgment has the burden to show there is no genuine issue of material fact and that he is entitled to judgment as a matter of law. In deciding whether there is a disputed material fact issue precluding summary judgment, we treat evidence favorable to the non-movant as true, and we resolve any doubts in his favor. *Nixon v. Mr. Property Management Co.*, 690

S.W.2d 546, 548–49 (Tex.1985); *Montgomery v. Kennedy*, 669 S.W.2d 309, 310–11 (Tex. 1984).

■ Santa Fe moved for summary judgment on two grounds. First, Santa Fe claimed that federal law preempted appellants' state tort law claims. Alternatively, Santa Fe argued that appellants' claims were barred because it had no authority to modify or add warning devices at the 16th Street crossing. The judgment in favor of Santa Fe did not state the grounds upon which it was granted. Where, as here, a summary judgment does not specify the grounds upon which the trial court granted it, the reviewing court will affirm the judgment if any one of the theories advanced in the motion is meritorious. *State Farm Fire & Cas. Co. v. S.S.*, 858 S.W.2d 374, 380 (Tex.1993); *Carr v. Brasher*, 776 S.W.2d 567, 569 (Tex.1989). In light of these considerations, we proceed with our review.

## ANALYSIS

### a. Federal Preemption

Appellants contend the trial court erred in granting Santa Fe's motion for summary judgment because their state law claims are not preempted by federal law. Both parties agree the disposition of this case is controlled by the Supreme Court's decision in *CSX Transp., Inc., v. Easterwood*, 507 U.S. 658, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993). In *Easterwood*, the Supreme Court considered whether a plaintiff's Georgia state law claims were preempted by the Federal Railroad Safety Act of 1970 (FRSA),[2] the Highway Safety Act of 1973,[3] and a series of grade crossing regulations adopted by the Secretary of Transportation.[4] The FRSA contains an express preemption clause which provides, in part:

---

1. Appellants in this case include David Ray Trevino, individually and as community survivor of, and personal representative of, the Estate of Erica A. Trevino, Michael Anthony Trevino, David Ray Trevino, Jr., and Vallerie Trevino; and George G. Flores and Silvestra "Betty" Flores, as surviving parents of Erica A. Trevino and as next friends of Nicole Gonzales, surviving child of Erica A. Trevino.

2. 45 U.S.C. §§ 421–447 (1988 & Supp. V 1993), *repealed by* Public Law 103–272 § 7(b), July 6, 1994, 108 Stat. 1379, current version at 49 U.S.C.A. §§ 20101–20153 (Supp.1995).

3. 23 U.S.C. §§ 101–160 (1988 & Supp. V 1993).

4. 23 C.F.R. 646.214(b)(3) and (4)(1995).

The Congress declares that laws, rules, regulations, orders and standards relating to railroad safety shall be nationally uniform to the extent practicable. A State may adopt or continue in force any law, rule, regulation, order, or standard relating to railroad safety *until such time as the Secretary has adopted a rule, regulation, order, or standard covering the subject matter of such State requirement.*

45 U.S.C. § 434 (1988) (emphasis added).

After analyzing 23 C.F.R. § 646.214(b)(3) and (4) as the only potential source of preemption in that case, the Court held, "a project for the improvement of a grade crossing *must either include an automatic gate or receive FHWA approval* if federal funds participate in the installation of the [warning] devices." *Easterwood,* 507 U.S. at 671, 113 S.Ct. at 1741.

Appellants contend further that subsections (A), (B), and (E) of 23 C.F.R. § 646.214(b)(3)(i)[5] required the FHWA to install at the 16th Street crossing automatic gates with flashing light signals since the crossing has multiple tracks, multiple tracks at or in the vicinity of the crossing which may be occupied by a train or locomotive so as to obscure the movement of another train approaching the crossing; buildings and structures on the railroad's right of way such as grain elevators; which restricted a driver's vision.

Appellants contend since there were no automatic gates with flashing light signals installed at the 16th Street crossing, the FHWA had no discretion to approve anything else and could not allow the continuation or repair of crossbuck signs which had been installed previously pursuant to state law.[6] We agree.

■ Appellees failed to prove that the secretary of the FHWA approved[7] either automatic gates with flashing light signals, crossbuck signs or reflector tape for crossbuck signs. We cannot assume the FHWA acted legally because the automatic gates with flashing light signals were not installed and that was only device for which FHWA could approve, for expenditure of federal funds. Further there was no proof that the 16th Street crossing was specifically within a federal project. The alleged federal project included a large geographical area including the 16th Street crossing but did not specify that crossing.[8] Even if the crossing was within the geographical area of the federal project it is immaterial since no automatic gate with flashing lights were ever installed. *Missouri Pacific R. Co. v. Lemon,* 861 S.W.2d 501, 513 (Tex.App.—Houston [14th Dist.] 1993, writ dism'd by agr.).

The federal regulations cited in this case do not conflict with the State law of negligence the appellants rely upon, i.e. negligent failure to install an automatic warning device and negligent failure to warn persons that the train was approaching or passing over the crossing. Neither is the inadequate

---

5. § 646.214(b)(3)(i) *Adequate warning devices,* under § 646.214(b)(2) or on any project where Federal-aid funds participate in the installation of the devices are to include *automatic gates with flashing light signals* when one or more of the following conditions exist:

    (A) Multiple main line railroad tracks.
    (B) Multiple Tracks at or in the vicinity of the crossing which may be occupied by a train or locomotive so as to obscure the movement of another train approaching the crossing.
    (C) High speed train operation combined with limited sight distance at either single or multiple track crossings.
    (D) A combination of high speeds and moderately high volumes of highway and railroad traffic.
    (E) Either a high volume of vehicular traffic, high number of train movements, substantial numbers of school buses or trucks carrying hazardous materials, unusually restricted sight distance, continuing accident occurrences, or any combination of these conditions.
    (F) A diagnostic team recommends them.

6. House Bill 2681, entitled "Enhanced Warning Sign Visibility at Railroad Crossings" was passed by the 71st Texas Legislature Regular Session. This Act was later codified as Texas Annotated Civil Statutes Article 6370b (Vernon Supp.1990).

7. There must be direct evidence of the Secretary's specific approval, in addition to federal financial participation. *Thiele v. Norfolk Western Ry. Co.,* 68 F.3d 179, 183 (7th Cir.1995).

8. There does not appear to be any statutory definition of "project" as used in this regulation. *Easterwood,* 507 U.S. at 673, 113 S.Ct. at 1742.

maintenance of warning devices, such as replacing reflectorized tape on crossbuck signs, or the failure to warn the public of defective devices preempted by federal law. *Hamlin v. Norfolk S. Ry.*, 686 So.2d 1115 (Ala. 1996); *Michael v. Norfolk S. Ry.*, 74 F.3d 271 (11th Cir.1996), §§ 646.214(b)(3) and (4). The trial court erred in refusing to rule on all of appellants' inadequate warning claims.

The federal cases cited by appellee, other than the *Easterwood* case, are not on point as they do not include a situation where the FHWA failed to approve either automatic gates or crossbuck signs where automatic gates were required.

We conclude there was no preemption of appellants' claims.

■ Appellee also claims it could have no liability for inadequate signs because it had no authority to modify or add warning signs. The *1980 Texas Manual on Uniform Traffic control Devices* ("MUTCD") is not authority to deny appellee from installing any warning device it wished. Appellee could have but chose not to install automatic gates with lights or other more effective devices at the 16th Street crossing. The cited portions of the *Manual* (MUTCD) merely requires that the type device chosen by the railroad be approved by the appropriate agency within a given State. *See CSX Transp., Inc.*, 507 U.S. at 668–69, 113 S.Ct. at 1740:

> It is the intent that the provisions of this manual be standards for traffic control device installation, but not a legal requirement for installation. . . . Rather than es-

tablishing an alternative scheme of duties incompatible with existing Georgia negligence law, the manual disavows any claim to cover the subject matter of that body of law.

MUTCD did not prohibit appellee from installing safer devices after obtaining the State agency's approval. *Lemon*, 861 S.W.2d at 520.

■ It will be a question of fact to determine whether appellee violated its common law duty to upgrade or add safer warning devices. The appellee cannot blame the State or the Manual for its responsibilities in such regard. That is not the intent of the Manual or any law cited in this case. Appellee's second reply point is overruled.

The judgment of the trial court is reversed and this cause is remanded for trial.

EDELMAN, Justice, concurring on Rehearing.

I concur with the result reached in the plurality opinion on rehearing, but for the reasons set forth below. The issue in this case is what facts must be proved to establish pre-emption for summary judgment purposes. In *Easterwood*, the United States Supreme Court stated:

> Examination of these regulations [23 CFR §§ 646.214(b)(3) and (4)[1]] demonstrates that, when they are applicable, state tort law is pre-empted. However, petitioner has failed to establish that the regulations apply to this case, and hence we find re-

---

1. Sections 646.214(b)(3) and (4) provide:

(3)(i) "Adequate warning devices" . . . on any project where Federal-aid funds participate in the installation of the devices are to include automatic gates with flashing light signals when one or more of the following conditions exist:

(A) Multiple main line railroad tracks.

(B) Multiple tracks at or in the vicinity of the crossing which may be occupied by a train or locomotive so as to obscure the movement of another train approaching the crossing.

(C) High speed train operation combined with limited sight distance at either single or multiple track crossings.

(D) A combination of high speeds and moderately high volumes of highway and railroad traffic.

(E) Either a high volume of vehicular traffic, high number of train movements, substantial numbers of school buses or trucks carrying hazardous materials, unusually restricted sight distance, continuing accident occurrences, or any combination of these conditions.

(F) A diagnostic team recommends them.

(ii) In individual cases where a diagnostic team justifies that gates are not appropriate, FHWA may find that the above requirements are not applicable.

(4) For crossings where the requirements § 646.214(b)(3) are not applicable, the type of warning device to be installed, whether the determination is made by a State regulatory agency, State highway agency, and/or the railroad, is subject to the approval of the FHWA. 23 CFR §§ 646.214(b)(3) and (4) (1992).

spondent's grade crossing claim is not preempted.

[U]nder §§ 646.214(b)(3) and (4), a project for the improvement of a grade crossing must either include an automatic gate or receive FHWA [Federal Highway Administration] approval if federal funds "participate in the installation of the [warning] devices." Thus, ... §§ 646.214(b)(3) and (4) displace state and private decisionmaking authority by establishing a federal-law requirement that certain protective devices be installed or federal approval obtained. Indeed, §§ 646.214(b)(3) and (4) effectively set the terms under which railroads are to participate in the improvements of crossings. The former section envisions railroad involvement in the selection of warning devices through their participation in diagnostic teams which may recommend the use or nonuse of crossing gates. Likewise, § 646.214(b)(4) which covers federally funded installations at crossings that do not feature multiple tracks, heavy traffic, or the like, explicitly notes that railroad participation in the initial determination of "the type of warning device to be installed" at particular crossings is subject to the Secretary's approval. In either case, the Secretary has determined that the railroads shall not be made to pay any portion of installation costs. In short, for projects in which federal funds participate in the installation of warning devices, the Secretary has determined the devices to be installed and the means by which railroads are to participate in their selection. The Secretary's regulations therefore cover the subject matter of state law which, like the tort law on which respondent relies, seeks to impose an independent duty on a railroad to identify and/or repair dangerous crossings.

*CSX Transp., Inc. v. Easterwood*, 507 U.S. at 668–72, 113 S.Ct. at 1740–41 (1993) (footnotes and citations omitted).[2]

In *Hester*, the Fifth Circuit found that the *Easterwood* pre-emption requirements were met where federal funds had been approved and expended in upgrading and installing reflectorized crossbucks at a crossing. *Hester v. CSX Transp., Inc.*, 61 F.3d 382, 386–87 (5th Cir.1995), *cert. denied*, 516 U.S. 1093, 116 S.Ct. 815, 133 L.Ed.2d 760 (1996). The opinion held that any challenge to the lack of evidence showing an actual determination by the Secretary of Transportation that those passive warning devices were adequate was precluded because, by law, federal funds could only be spent on projects that satisfied the applicable regulations:

> The regulations direct the Secretary to authorize the expenditure of federal funds only on projects that satisfy, *inter alia*, the requirements of federal law.... The fact that federal funds participated in the installation of the warning devices [thus] legally presupposes that the Secretary approved and authorized that expenditure, which in turn legally presupposes that the Secretary determined that the safety devices installed were adequate to their task. There is no evidence that this did not in fact happen. Nor is there any evidence demonstrating that passive warning devices alone were deemed inadequate...to promote safety at [the crossing].

*Hester*, 61 F.3d at 387 (footnotes and citations omitted); *see also* 23 U.S.C. § 109(e); 23 C.F.R. 630.112(c), 630.114(b), (g). Importantly, however, *Hester* acknowledged that "[o]f course, passive warning devices are not adequate where section 646.214(b)(3) applies," and that "its seems clear on the facts before us that the applicable provision is section 646.214(b)(4)" because the crossing in question "was a rural crossing and that therefore subsections (A) through (E) of section 646.214(b)(3)(i) were not applicable." *Hester*, 61 F.3d at 386 n. 6.[3]

---

**2.** However, federal funds were held not to have participated in the installation of warning devices at the crossing in question in *Easterwood* because the project to install a crossing gate there was abandoned after motion-detection circuitry was installed, and because the circuitry installed did not meet the definition of a warning device. *CSX Transp., Inc. v. Easterwood*, 507

U.S. 658, 670–72, 113 S.Ct. 1732, 1741, 123 L.Ed.2d 387 (1993).

**3.** Although section 646.214(b)(3) conditions may be *less likely* to exist at a rural crossing, it is not clear how the non-existence of those conditions could be presumed in favor of a movant for

In this case, as evidence of the expenditure of federal funds for the installation of warning devices at the 16th Street Crossing, Santa Fe offered, among other things, the affidavit of John Dodson, a railroad crossing consultant and former engineer with the Texas Department of Highways & Public Transportation, and the affidavit of Darin Kosmak, the Railroad Liason Manager, Traffic Operations Division for the Texas Department of Transportation. The Dodson affidavit stated, in part:

> For many years, the State of Texas has received and continues to receive federal highway funds under the Federal Highway Safety Act....
>
> In 1977, the Federal Highway Department implemented a program to improve *all unsignalized public grade crossings in Texas.* Between 1977 and 1981, the State of Texas received Federal Highway Funding in order to implement this program.
>
> In 1991, ... federal funds ... were used to finance the installation of reflective tape *on all crossbuck signs in Texas.* ... Additionally, ... federal funds ... were used to update information *on all off-system crossings* at city street and county roads in Texas.

(emphasis added). Similarly, the Kosmak affidavit stated, in part:

> In 1977 the Texas Department of Transportation (formerly known as the State Department of Highways and Public Transportation) implemented a program to improve *all unsignalized public grade crossings in Texas.* Between 1977 and 1981 the State of Texas received Federal Highway Funding in order to implement this program.
>
> Pursuant to Section 203 of the Federal–Aid Highway Act of 1976, all crossbuck protected crossings on The Atchison, Topeka and Santa Fe Railway Company's road crossings received the benefit of Federal Funds between approximately 1977 and 1981. These funds were expended to either install or upgrade crossing protection at *all crossbuck-protected crossings ....*
>
> *Under this program, the Secretary of Transportation determined the type of warning devices to be installed at ... [the] 16th Street [crossing] ....* [4]

(emphasis added). In addition, one of the exhibits attached to the Kosmak affidavit was a 1989 letter from the United States Department of Transportation to the former State Department of Highways and Public Transportation (the "1989 DOT letter") which stated, in part:

> The Federal Highway Administration (FHWA) has completed a research activity directed at enhancing the safety of rural railroad grade crossings. This research involved the use of existing low-cost retroreflective devices to focus the driver's attention at a nonsignalized crossing when a train is present. Each year there are approximately 800 accidents resulting in about 60 fatalities and 400 injuries where a motorist runs into the side of a train at night.[5] Many of these accidents occur at low-volume crossings that only have advance warning signs, crossbucks and pavement markings. Because the use of active railroad grade crossing devices such as flashing lights and gates are not warranted at these crossings, improvements are generally not made. The devices detailed in this letter provide the opportunity to enhance safety at these railroad crossings....
>
> ....
>
> *These devices are not intended to be used in lieu of upgrading when it is warranted,*

---

summary judgment merely because a crossing is rural.

**4.** This hearsay statement is not substantiated with documentation or other basis for the affiant's personal knowledge. Nor does the affidavit indicate whether the Secretary's approval was given with regard to that particular crossing specifically, or simply as to all crossbuck protected crossings, as the previous paragraph would suggest.

**5.** The accident in this case occurred in mid-afternoon and involved an automobile being struck by a train as the auto crossed the track, rather than a motorist running into the side of a train. The Trevinos allege that the visibility of the oncoming train was obscured by grain silos and buildings on or near the right of way.

*but rather at crossings with passive warning systems where low-volume use makes other types of safety improvements impractical. Federal-aid funds may be used to fund these low-cost improvements.*

(emphasis added).

Although the Trevinos offered summary judgment evidence that the 16th Street crossing had no automatic gates or flashing lights, there was no summary judgment evidence that a "diagnostic team" or other federal authority had ever evaluated whether any subsection (b)(3)(i) conditions were present there. However, the Highway Safety Act of 1973

> makes federal funds available to the States to improve grade crossings, in return for which the States must "conduct and systematically maintain a survey of all highways to identify those railroad crossings which may require separate, relocation, or protective devices, and establish and implement a schedule of projects for this purpose." 23 U.S.C. § 130(d).

*Easterwood,* 507 U.S. at 662–64, 113 S.Ct. at 1737. In addition, under federal regulations,

> Each State receiving federal aid is required to establish a "highway safety improvement program" that establishes priorities for addressing all manner of highway hazards and guides the implementation and evaluation of remedial measures. 23 CFR pt. 924 (1992). In setting priorities, the States are directed to consider and rank the dangers posed by grade crossings. § 924.9(a)(4). Having developed a program, each State must evaluate its effectiveness and costs, § 924.13, and file yearly reports with the FHWA. § 924.15.

*Easterwood,* 507 U.S. at 664–68, 113 S.Ct. at 1738 (footnote omitted).

*Easterwood* says, in effect, that in order for an expenditure of federal funds on warning devices at a railroad crossing to effect pre-emption, the expenditure "must either include an automatic gate or receive FHWA approval." *Easterwood* does not specify whether this "approval" refers to (1) approval of merely the type of warning device generally, *i.e.,* without regard to the characteristics of the crossing at which it will be used;

(2) approval of merely the non-use of an automatic gate at the crossing without specific approval of the warning device to be used; or (3) specific approval of the warning device with regard to the characteristics of the particular crossing at which it will be used.

Importantly, however, a central objective of the regulations is that automatic gates be installed at crossings where conditions listed in subsection (b)(3)(i) exist ("(b)(3)(i) crossings"). A corresponding objective of the regulations is that federal funds not be spent on warning devices other than an automatic gate at a(b)(3)(i) crossing which lacks such a gate unless federal approval is given for doing so. Therefore, to the extent a(b)(3)(i) crossing has no automatic gate, has received no federal approval for lacking a gate, and federal funds are nevertheless spent on other types of warning devices at the crossing, the objective of the regulation is not achieved, federal approval cannot properly be presumed, and, as alluded to in *Hester,* pre-emption is not justified.

On the other hand, Santa Fe's summary judgment evidence contained data from the Texas Department of Highways and Public Transportation indicating that Texas alone had over 15,000 railroad crossings of public roads in 1976. Moreover, the affidavits and letter quoted above reflect that expenditures of federal funds to upgrade crossings, such as with reflectorized material, have sometimes been "approved" and made on a large scale without necessarily being "approved" with regard to the individual conditions at each crossing. Given the number of crossings and the ongoing need to maintain and upgrade warning devices at each, it may well be unworkable from a practical standpoint to obtain individual federal approval for each crossing before each expenditure on warning devices is made. In addition, there is no evidence in this case whether, in carrying out the federal programs, the State of Texas was in compliance with its obligations to survey, prioritize and schedule projects to address dangers posed at crossings under the provisions outlined in *Easterwood.*

We are thus left with a situation in which (b)(3)(i) as well as non-(b)(3)(i) crossings

could have received federally funded warning devices without *specific* federal approval having been given for any of them. Under these circumstances, if such specific approval must be shown to effect pre-emption, few non-(b)(3)(i) crossings might qualify, whereas if specific approval is not required, some (b)(3)(i) crossings which lack gates might qualify. In order to balance these competing considerations, I would hold that where a proponent can establish by summary judgment evidence or at trial that the crossing in question is not a (b)(3)(i) crossing, the general approval given for a federal expenditure to install warning devices there should be deemed to satisfy *Easterwood* and support pre-emption.

In this case, Santa Fe's summary judgment evidence showed that federal funds were spent on installing or upgrading reflectorized crossbucks at the 16th Street Crossing, but did not establish that the 16th Street crossing was not a (b)(3)(i) crossing. Contrary to *Hester*, for summary judgment purposes, we may not infer or presume any such fact in favor of the movant.[6] Therefore, I concur with the plurality opinion on rehearing that the summary judgment should be reversed and the case remanded for further proceedings.

LEE, Justice, dissenting on Rehearing.

To the extent the plurality holds that the Trevino's state law claims based on inadequate signalization are not preempted by federal law, I respectfully dissent.

As the plurality correctly points out, this case is controlled by *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 113 S.Ct. 1732, 123

L.Ed.2d 387 (1993), where the United States Supreme Court considered whether a plaintiff's state law claims based on inadequate signalization were preempted by federal law. After analyzing 23 C.F.R. § 646.214(b)(3) and (4), the Court found that such claims are preempted "if federal funds participate in the installation of warning devices at a crossing." *Easterwood*, 507 U.S. at 670, 113 S.Ct. at 1741.

Since *Easterwood*, many courts have examined the issue of the preemption of state law claims based on inadequate signalization. In *Hester v. CSX Transp., Inc.*, 61 F.3d 382 (5th Cir.1995), *cert. denied*, 516 U.S. 1093, 116 S.Ct. 815, 133 L.Ed.2d 760 (1996), the plaintiffs' son was killed at a railroad crossing in Orange Grove, Mississippi. *Id.* at 383. At the time the accident occurred, the crossing was equipped only with reflectorized crossbucks and other passive warning devices. *Id.* at 386.[1] After discussing *Easterwood*, the Fifth Circuit explained, "[t]he test we thus must apply is whether federal funds 'participated' in the installation of 'warning devices' at the Hately Circle crossing. If they have, the Hesters' common law claims based on inadequate signalization are preempted." *Id.* The court ultimately found the evidence supported the defendant's claim of preemption. Other courts, including this court, have strictly followed the straightforward preemption test articulated in *Hester*. *Armijo v. Atchison, Topeka and Santa Fe Ry. Co.*, 87 F.3d 1188, 1189 (10th Cir.1996); *Elrod v. Burlington N.R.R.*, 68 F.3d 241, 243 (8th Cir.1995); *Hatfield v. Burlington N.R.R.*, 1 F.3d 1071, 1072 (10th Cir.1993) ("the precise issue to be resolved is whether 'federal-aid funds participate[d] in the instal-

---

**6.** *See supra* note 3. A movant for summary judgment has the burden to show that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. Tex.R. Civ. P. 166a(c). To be entitled to summary judgment, a defendant must either (1) conclusively negate at least one essential element of each of the plaintiff's causes of action, or (2) conclusively establish each element of an affirmative defense to each claim. *Johnson County Sheriff's Posse v. Endsley*, 926 S.W.2d 284, 285 (Tex.1996). In reviewing a summary judgment, the nonmovant's evidence is accepted as true, and all doubts regarding the evidence are resolved and all inferences indulged in the nonmovant's favor. *Id.*

**1.** "Passive warning devices" are "those types of traffic control devices, including signs, markings and other devices, located at or in advance of grade crossings to indicate the presence of a crossing but which do not change aspect upon approach or presence of a train." Conversely, "active warning devices" are "those traffic control devices activated by the approach or presence of a train, such as flashing light signals, automatic gates and similar devices, as well as manually operated devices and crossing watchmen, all of which display to motorists positive warning of the approach or presence of a train." 23 C.F.R. §§ 646.204(i), (j).

lation of [a warning] device' prior to the collision...."); *Missouri Pac. R.R. v. Lemon*, 861 S.W.2d 501, 514 (Tex.App.—Houston [14th Dist.] 1993, writ dism'd by agmt.) (holding "the only question" relevant to preemption is whether federal funds participated in the installation of the warning devices).

In the present case, it is undisputed that passive warning devices were installed at the 16th Street crossing.[2] Therefore, the issue is whether federal funds participated in the installation of these warning devices.[3]

Santa Fe's summary judgment proof includes Texas Department of Transportation ("TDOT")[4] records and the affidavits of former and present TDOT and Santa Fe representatives which, contrary to the plurality's opinion, demonstrate that federal funds *were* approved and expended for the installation and upgrading of reflectorized crossbucks at the 16th Street crossing. Darin K. Kosmak, TDOT's Railroad Liaison Manager, and John Dodson, former TDOT Bridge Division Railroad Liaison, explained that in 1977, TDOT implemented a program to improve all unsignalized public grade crossings in Texas. This program, administered pursuant to Section 203 of the Federal Aid Highway Act of 1976 and approved by the Federal Highway Administration ("FHWA"), utilized a total of $11,222,382 of federal funds to install reflectorized crossbucks at railroad crossings that did not have active warning devices. Kosmack stated the installation of steel crossbucks in District 5, "which included DOT Crossing No. 017–331N at the 16th Street crossing in Abernathy," was completed in

1980 at a cost of $641,000.68. Kosmack also pointed out that 100% of the District 5 project was federally funded.

Kosmack's claim that federal funds were approved and used to install the crossbucks at the 16th Street crossing is supported by Don Morris' affidavit. Morris, who from 1977 through 1981 was responsible for the repair or replacement of warning devices at the 16th Street crossing, verified that in 1980, the wooden posts and crossbucks at the crossing were replaced by galvanized steel posts and crossbucks. Morris stated that the project was not funded by Santa Fe.

Santa Fe's summary judgment proof also contains a 1989 letter in which the United States Department of Transportation ("USDOT") advised the TDOT that reflectorized material should be attached to the backs of the posts and crossbucks located at "low-volume crossings that only have advance warning signs, crossbucks and pavement markings." The letter further recognized that "the use of active railroad grade crossing devices such as flashing lights and gates are not warranted at these crossings...."

Kosmak and Dodson indicated that in 1989, in response to the USDOT's concerns, the Texas Legislature passed House Bill 2681, which mandated the installation of reflectorized material to the backs of all crossbuck signs and support posts located at crossings without active warning devices.[5] This Act covered the 16th Street crossing in Abernathy, Texas. The project was completed in August of 1991, and the amount of federal

---

2. Santa Fe's summary judgment proof includes exhibits showing two reflectorized crossbuck signs were located at the 16th Street crossing at the time the accident occurred. Crossbucks, the X-shaped signs spelling out "RAILROAD CROSSING," are passive warning devices that face oncoming traffic on each side of a crossing.

3. This is not to suggest that state law claims based on inadequate signalization are *automatically* preempted by federal law simply because some federal funds are spent to install warning devices at a crossing. The Tenth Circuit has held that federal participation must be "significant" rather than merely a "casual financial connection" in order to trigger preemption. *Armijo v. Atchison, Topeka & Santa Fe Ry. Co.*, 19 F.3d, 547, 550 (10th Cir.1994). The Eighth Circuit has held that federal financial participation triggers

preemption only when warning devices have been completely installed and are operational. *St. Louis S.W. Ry. Co. v. Malone Freight Lines*, 39 F.3d 864, 866–67 (8th Cir.1994), *cert. denied*, 514 U.S. 1110, 115 S.Ct. 1963, 131 L.Ed.2d 854 (1995). Nothing suggests either of these conditions would apply to defeat preemption in the case at bar.

4. The TDOT is formerly known as the State Department of Highways and Public Transportation.

5. House Bill 2681, entitled "Enhanced Warning Sign Visibility at Railroad Crossings" was passed by the 71st Texas Legislature Regular Session. This Act was later codified as Texas Annotated Civil Statutes Article 6370b (Vernon Supp.1990).

funds approved and expended for this project was $1,371,384; ninety percent of the project's total cost.

This summary judgment proof was uncontroverted. In fact, Dr. Kenneth W. Heathington, the Trevino's own expert, conceded the 16th Street crossing received the benefit of federal funds. Based on this record, I would hold that Santa Fe has established that federal funds participated in the installation of the warning devices at the 16th Street crossing.

The plurality asserts that Santa Fe offered no summary judgment proof showing the FHWA *expressly* approved the installation of only passive warning devices at the 16th Street crossing and holds that such approval is essential to support a finding of preemption. I disagree.

Santa Fe's summary judgment proof includes a document entitled "Letter of Approval and/or Authorization" (the "letter") in which the FHWA expressly approved the use of federal money to fund the 1991 project. Specifically, the letter provided that, "[s]tate forces are authorized to (1) install crossbuck reflectorization kits and (2) replace missing crossbuck signs." As noted, these federal funds were used to place reflectorized material to the backs of the crossbucks and posts at the 16th Street crossing.

However, even without this document, the plurality's assertion that "[t]here must be direct evidence of the Secretary [of Transportation's] specific approval" in order to trigger preemption is incorrect.[6] In *Easterwood*, the Supreme Court stated, "[f]or projects in which federal funds participate in the installation of the warning devices, *the Secretary has determined the devices to be installed* and the means by which railroads are to participate in their selection." *Easterwood*,

507 U.S. at 671, 113 S.Ct. at 1741 (emphasis supplied). In *Hester*, the Fifth Circuit further explained:

The regulations direct the Secretary [of Transportation] to authorize the expenditure of federal funds only on projects that satisfy, *inter alia*, the requirements of federal law, specifically 23 U.S.C. § 109. Under that section, "[n]o funds shall be approved for expenditure ... unless proper safety protective devices complying with safety standard *determined by the Secretary at that time as being adequate* shall be installed or be in operation at any highway and railroad grade crossing...." The fact that federal funds participated in the installation of the warning devices legally presupposes that the Secretary approved and authorized that expenditure, which in turn legally presupposes that the Secretary determined that the safety devices installed were adequate to their task.

*Hester*, 61 F.3d at 387 (citations omitted); *see also Elrod*, 68 F.3d at 244 (holding that "[f]ederal funding is the touchstone of preemption in this area because it indicates that the warning devices have been deemed adequate by federal regulators."); *Armijo*, 87 F.3d at 1191 (joining the Fifth and Eighth Circuits in finding that the participation of federal funds legally presupposes the Secretary of Transportation's approval of the type of safety devices installed).

As the Supreme Court, as well as the Fifth, Eighth, and Tenth Circuits have pointed out, federal law prohibits the Secretary of Transportation from approving the expenditure of federal funds unless the Secretary *first* determines the warning devices to be installed are adequate. *Easterwood*, 507 U.S. at 670–71, 113 S.Ct. at 1741; *Armijo*, 87 F.3d at 1191; *Elrod*, 68 F.3d at 244; *Hester*,

---

6. The plurality cites *Thiele v. Norfolk Western Ry. Co.*, 68 F.3d 179 (7th Cir.1995) to support its contention that direct evidence of the Secretary's specific approval must exist before preemption applies. *Thiele* is a Seventh Circuit case and is based on the court's previous holding in *Shots v. CSX Transp., Inc.*, 38 F.3d 304 (7th Cir.1994). In *Shots*, the court acknowledged that under *Easterwood*, if the Secretary of Transportation's approval and funding of a project could be interpreted as an affirmative determination that reflectorized crossbucks were sufficient under 23

C.F.R. § 646.214(b)(4), state law claims based on inadequate signalization would be preempted. However, the court declined to read *Easterwood* "literally" and held that the Secretary's funding of crossing devices did not necessarily imply federal approval of particular measures taken at particular crossings sufficient to preempt state law. *Id.* at 307. This holding has been soundly criticized and uniformly rejected by courts considering the issue of secretarial approval. *See Armijo*, 87 F.3d at 1191–92; *Elrod*, 68 F.3d at 244; *Hester*, 61 F.3d at 387.

61 F.3d at 387; *see* 23 U.S.C. § 109(e). In this case, the plurality's finding that the Secretary approved the expenditure of federal funds without first determining the safety devices at the 16th Street crossing were adequate, not only ignores well reasoned, authoritative precedent, it also implicitly suggests the Secretary has violated federal law. I cannot reach such a conclusion.

*Hester* establishes a legal presumption which assumes that secretarial approval of the use of federal funds to install warning devices is equivalent to a determination that the devices were adequate at the crossing in question. *Hester*, 61 F.3d at 387. Therefore, absent of some evidence demonstrating that at the time the Secretary approved the 1980 and 1991 crossbuck projects, the Secretary indicated the reflectorized crossbucks were inadequate to warn the public of danger at the 16th Street crossing, we must presume the Secretary determined that reflectorized crossbucks were adequate warning devices. *See, e.g., Armijo*, 87 F.3d at 1192; *Hester*, 61 F.3d at 387.

Finally, the plurality points out that no automatic gates were installed at the 16th Street crossing as required by 23 C.F.R. § 646.214(b)(3). The plurality maintains that the FHWA had "no discretion to approve anything else and could not allow the continuation or repair of crossbuck signs which had

been installed previously pursuant to state law." The court then holds that because Santa Fe failed to establish that automatic gates were installed at the 16th Street crossing, summary judgment should be reversed. Once again, I disagree.

In *Easterwood*, the Court held that "under §§ 646.213(b)(3) and (4), a project for the improvement of a grade crossing must *either* include an automatic gate *or* receive FHWA approval if federal funds 'participate in the installation of the [warning] devices.'" *Easterwood*, 507 U.S. at 670, 113 S.Ct. at 1741 (footnote omitted and emphasis supplied). Santa Fe's uncontroverted summary judgment proof clearly shows that FHWA officials approved the expenditure of federal funds that participated in the installation and upgrade of the warning devices at the 16th Street crossing. Contrary to the plurality's assertion, "[t]he fact that federal funds participated in the installation of the warning devices legally presupposes that the Secretary approved and authorized the expenditure, which in turn legally presupposes that the Secretary determined that the safety devices installed were adequate to their task." *Hester*, 61 F.3d at 387. The plurality's contention that a finding of preemption hinges upon the presence or absence of automatic gates at the crossing is simply incorrect.[7]

---

7. The concurrence concedes that Santa Fe's summary judgment proof shows that federal funds were spent to install and upgrade reflectorized crossbucks at the 16th Street crossing. Nevertheless, the concurrence would hold that summary judgment is improper in this case because Santa Fe "did not establish that the 16th Street crossing was not a (b)(3)(i) crossing." The concurrence further suggests that contrary to the proper standard of review of summary judgments, *Hester* indulges an inference in favor of the movant that the crossing in question was not a (b)(3)(i) crossing. I disagree with this conclusion for two reasons.

First, *Hester* infers no such fact. Rather, *Hester* recognizes a *legal presumption* that the participation of federal funds implies the Secretary of Transportation has approved the type of safety device installed. *See Hester*, 61 F.3d at 387. A legal presumption is a rule of law, statutory or judicial, by which the finding of a basic fact gives rise to the existence of the presumed fact, until the presumption is rebutted. BLACK's LAW DICTIONARY 1067 (5th ed.1979). Conversely, an inference is a deduction of fact that may logically and

reasonably be drawn from another fact or group of facts found or otherwise established. BLACK's LAW DICTIONARY 700 (5th ed.1979). In my opinion, recognizing the legal presumption articulated in *Hester* does not offend the standard of review we apply to summary judgments.

Second, I believe the concurrence confuses the issue of preemption with its search for the correct label to attach to the 16th Street crossing. The fundamental issue in determining whether preemption applies is whether the federal government has "displace[d] state and private decisionmaking authority by establishing a federal-law requirement that certain protective devices be installed or federal approval obtained." *Easterwood*, 507 U.S. at 670, 113 S.Ct. at 1741. In the present case, the Secretary agreed to provide the funds necessary to install reflectorized crossbucks at a number of railroad grade crossings in Texas, including the crossing where the Trevinos were injured. At the point the Secretary approved the expenditure of the funds, the 16th Street crossing became a "project where Federal-aid funds participate in the installation of [warning] devices," 23 C.F.R. § 646.214(b)(3)(i),

The record in this case clearly demonstrates that significant federal funds participated in the installation and upgrade of the warning devices at the 16th Street crossing. Because federal expenditure is the touchstone of preemption in this area, I would hold that the Trevino's state tort law claims based on Santa Fe's failure to provide adequate warning devices are preempted by federal law and would affirm that portion of the summary judgment.[8]

and the type of warning device used was under the Secretary's control. The Secretary's authorization of passive warning devices was "tantamount to a determination, pursuant to 23 C.F.R. § 646.214(b)(4), that only passive rather than active warning devices were sufficient," and that determination took the matter out of Texas' and Santa Fe's hands. *See Armijo*, 87 F.3d. at 1190.

8. The plurality emphasizes that state law claims based on the inadequate maintenance of warning devices and the failure to warn the public of defective devices are not subject to preemption. I agree. *Easterwood, Hester, Elrod*, and *Armijo* dealt exclusively with whether state law claims based on inadequate signalization are preempted by federal law. However, the plurality's emphasis relating to this point is puzzling because the Trevino's pleadings contain no allegations that Santa Fe inadequately maintained the crossbucks or failed to warn the public of defective warning devices.