LYONS, Justice
(dissenting).
I respectfully dissent from the majority’s decision to affirm without opinion the trial court’s summary judgment for the defendants. In my view, this case has several questions of fact that make a summary judgment inappropriate, and, moreover, federal law does not preempt the plaintiffs claims, as the trial court held.
This case involves a collision in Calhoun County between a tractor-trailer truck driven by Nathaniell Dillard and a Norfolk Southern Railway Company train; the collision resulted in Dillard’s death. Dillard’s widow, Johnnie L. Dillard, sued the Railroad and its engineer, Wallace Dobbs, in her personal capacity and as personal representative of the estate of Nathaniell Dillard.
The following facts are undisputed: On February 19, 1993, at approximately 1:50 p.m., Dillard was driving, at about 15 m.p.h., southbound on County Road 45, also known as DeArmanville Road, in Calhoun County. Although the sky was cloudy, the weather conditions were otherwise clear. As Dillard approached the crossing where County Road 45 and the Railroad’s main lines intersect (the DeArmanville crossing), he passed a sign indicating that a stop sign was ahead and passed the advance warning sign of “R x R” painted on the road. At the crossing itself, the County had placed a stop sign some 40 feet from the track, where the road takes a 90-degree right turn toward the tracks. Also, railroad crossbuck signs were on both sides of the railroad tracks. Several trees stood to Dillard’s right, the direction from which the train approached.
According to the Railroad’s conductor and engineer, who were the only eyewitnesses to the collision, the train approached the crossing from behind Dillard, because the tracks run parallel with the road. They said that when Dillard got closer to the tracks, he slowed to approximately 5 m.p.h. to negotiate the unusual sharp right turn, but did not come to a complete stop at the stop sign. Then, they say, Dillard straightened up to proceed across the tracks and as he attempted to cross the tracks the train hit his truck.
The DeArmanville crossing has two main railroad lines. It is also reported to be a very dangerous crossing because, from 1976 through April 1993, 18 accidents occurred there, including 4 involving fatalities. The Railroad had knowledge of these *446 accidents. Furthermore, the Railroad’s engineer, who on the day of the collision was responsible for blowing the train’s whistle, acknowledged that he had experienced several “near misses” at the DeAr-manville crossing, some so significant that he had felt compelled to report them.
To make the crossing safer, the Federal Highway Administration (FHWA) had provided funding for three projects to install warning devices at the crossing. Project 1, completed in 1978, involved the installation of two “no passing zone” signs and two “R x R” pavement markings. No diagnostic team[1] reviewed this project. In Project 2, completed in 1991, a few hundred federal dollars were used to paint a double centerline and “no passing” markings on the pavement on both sides of the crossing.
In 1988, before Project 2 was undertaken, the groundwork for Project 8 was begun, when a diagnostic team, including employees of the Railroad, studied the crossing. The team recommended to the Secretary of the United States Department of Transportation and to the Alabama Department of Transportation the installation of active warning devices.[2] On August 7, 1989, the FHWA selected the crossing for the installation of active warning devices.[3] The Railroad’s engineers began formulating plans for this project in 1991, and the federal funds were approved in 1992. However, these warning devices were not completely installed until April 26, 1993, more than two months after Dillard’s collision with the train on February 19, 1993. Also as a part of Project 3, the trees at the crossing were removed.
The parties presented conflicting testimony regarding critical aspects of this case. The conductor and the engineer both stated that the engineer sounded the train’s whistle as they approached the crossing.[4] However, the plaintiff introduced the affidavit of Tommy Gee, who stated that at the time of the accident he was driving nearby, with his window halfway down and his radio off. He also stated that he was very near the accident but that he never heard the whistle. Furthermore, the engineer testified that he applied the train’s brakes, but the conductor stated that he did not recall any braking and that the engineer told him that he did not apply the tram’s brakes.
The other conflicting evidence concerns Dillard’s alleged contributory negligence. The conductor and the engineer both testified that Dillard caused the accident by failing to stop at the crossing. However, the plaintiff produced the affidavit of an expert who stated that Dillard could not have seen the train coming even if he had stopped, because of the sharp curve in the road at the crossing, the distance of the stop sign from the crossing, the obstruction of his view by the trees, the fact that he was driving a tractor-trailer, and the fact that the train approached from behind him.
In her complaint, the plaintiff made the following allegations: (1) that the defendants, the Railroad and the engineer, as its agent, negligently or wantonly operated *447 the train on February 19, 1993; (2) that the defendants negligently or wantonly constructed, maintained, and operated the crossing and the intersection; and (3) that the defendants negligently or wantonly failed to install proper warning devices at the intersection. The trial court entered a summary judgment in favor of the Railroad and the engineer on all claims, and the plaintiff appealed. The majority affirms the judgment. However, for the reasons discussed below, I believe the summary judgment should be reversed and the case remanded. (Johnnie Dillard appealed all claims except for her claim of negligence or wantonness based on the train’s speed. Therefore, I will address only her other claims.)

Standard for Review of a Summary Judgment

The principles of law applicable to a motion for summary judgment are well settled. For the trial judge to grant a motion for summary judgment, he or she must determine that the evidence does not create a genuine issue of material fact and that the movant is entitled to a judgment as a matter of law. Rule 56(c)(3), Ala. R. Civ. P. When the movant makes a prima facie showing that those two conditions are satisfied, the burden shifts to the nonmov-ant to present substantial evidence creating a genuine issue of material fact. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala.1989). Evidence is “substantial” if it is of “such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.” West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989).
In reviewing a summary judgment, we apply the same standard the trial court applied when it relied on the summary judgment motion. Ex parte Lumpkin, 702 So.2d 462, 465 (Ala.1997). Our review is further subject to the caveat that we must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant. Hanners v. Balfour Guthrie, Inc., 564 So.2d 412, 413 (Ala.1990).

I. Claim of Negligence Based on the Alleged Failure to Sound the Whistle

The plaintiff argues that she presented substantial evidence creating a genuine issue of material fact as to whether the engineer, as the Railroad’s agent, negligently failed to sound the whistle. I agree. The plaintiff produced the affidavit of Tommy Gee, who stated that he was near the crossing at the time of the collision and did not hear any whistle blasts. Therefore, a jury could have found that the engineer breached a duty owed to Dillard.
The defendants, however, argue that this claim is barred because, they claim, Dillard was contributorily negligent as a matter of law because he failed to stop at the stop sign at the crossing, and because this failure caused the collision. The trial court agreed with the defendants. For several reasons, I believe that conclusion is incorrect.
First, the issue of contributory negligence is generally one for the jury to determine. Adams v. Coffee County, 596 So.2d 892, 895 (Ala.1992). Second, to prove that Dillard was contributorily negligent as a matter of law, the defendants had the burden of proving that there was no issue of material fact (1) as to whether Dillard failed to exercise reasonable care (i.e., as to whether he failed to stop, look, and listen) and (2) as to whether “that failure was the proximate cause of the accident.” Norfolk S.R.R. v. Thompson, 679 So.2d 689, 692 (Ala.1996) (citing Slade v. City of Montgomery, 577 So.2d 887, 892 (Ala.1991)).
I believe the plaintiff produced substantial evidence indicating that Dillard’s failure to stop did not proximately cause the collision. The plaintiff tendered an expert’s affidavit. The expert expressed the opinion that the DeArmanville crossing *448 was very dangerous. He also stated that Dillard could not see the train because of the trees standing to his right, the sharp curve in the road just before the crossing, the fact that he was driving a tractor-trailer, and the fact that the train approached from behind him. Based upon those facts, the expert concluded that Dillard could not have seen the train even if he had stopped at the stop sign. Thus, this affidavit created a factual question for the jury as to whether Dillard was contrib-utorily negligent.
The third reason I believe Dillard cannot be held to have been contributorily negligent as a matter of law is that this case is very similar to Thompson, supra. In Thompson, the decedent was killed when a train struck his vehicle. 679 So.2d at 690. As in this case, the engineer in Thompson testified that he blew his whistle but other witnesses said they did not remember hearing any whistle. Id. Also, the engineer in Thompson stated that the decedent did not stop at the track and did not look for an oncoming train. Furthermore, the evidence showed that the crossing was a hazardous one. Id. at 692. The plaintiff in Thompson proved that a sharp curve existed in the road near the crossing and that foliage had obstructed the decedent’s view. Id. at 692-93. The plaintiffs expert testified that the sharp curve and the foliage both limited the decedent’s sight distance and put extra demands on any motorist approaching the crossing. Id. These facts, the expert said, prevented the decedent from seeing the train with enough time to prevent the collision, even if he had stopped at the stop sign. Id.
In rejecting the defendants’ contention that the decedent in Thompson was con-tributorily negligent as a matter of law, this Court held that the evidence introduced by the plaintiff, and the testimony of the plaintiffs expert, created a jury question as to whether the decedent’s failure to stop had caused the collision. Id. at 693. Based upon this conclusion and the similarities between Thompson and this case, I believe this plaintiff has also created a question of fact for the jury. Therefore, I disagree with the trial court’s holding that Dillard was contributorily negligent as a matter of law. The summary judgment was improper as to this issue.

II. Claim of Wantonness Based on the Alleged Failure to Sound the Whistle

The plaintiff next argues that the summary judgment was improper as to her wantonness claim; that claim alleged that the engineer wantonly failed to sound the train’s whistle as the train approached the crossing. First, I note that the summary judgment on this claim was based on a holding of contributory negligence. The trial court held that “[wjhether the horn was sounded properly is immaterial and irrelevant” and that the defendants were entitled to a judgment “on all claims of the plaintiff on the basis that the negligence of the plaintiffs decedent was the sole proximate cause of the accident and death here in question.” (Emphasis added.) Contributory negligence is not a defense to a claim of wantonness. John R. Cowley & Bros., Inc. v. Brown, 569 So.2d 375, 381 (Ala.1990). Therefore, as to the wantonness claim, the trial court’s ruling was incorrect and should be reversed.
Second, I believe the plaintiff produced substantial evidence creating a question of fact as to whether the engineer wantonly failed to sound the whistle at the crossing. Justice Houston stated in Hamme v. CSX Transp., Inc., 621 So.2d 281, 283 (Ala.1993):
“To be wanton, it is not required that the actor know that a person is within the.zone made dangerous by the actor’s conduct; rather, it is sufficient that the actor knows that there is a strong possibility that another might rightfully come within the zone. The actor’s knowledge may be proved by showing circumstances from which the fact of knowledge is a reasonable inference; it need not be proved by direct evidence.”
*449 (Citations omitted.) In Hamme, the Court gave two definitions of wantonness, the first of which applies to this present case: “Wantonness does not require an intent to injure another, but may consist of an inadvertent act or failure to act, when the one acting or failing to act has knowledge that another is probably imperiled by the act....” Id. at283.
Viewing the evidence in the light most favorable to the plaintiff, as we must, I conclude that the evidence indicates the engineer knew that he was required to sound his whistle at the DeArmanville crossing to warn approaching drivers. He personally had experienced several “near misses” at the DeArmanville crossing. He also saw Dillard approaching the crossing, yet, based on the testimony of a person who was driving nearby, one could find that the engineer failed to sound the whistle. Thus, under these circumstances, I conclude that the plaintiff presented sufficient evidence to create a genuine issue of material fact as to whether the engineer failed to act and thereby “imperiled” Dillard. The summary judgment was improper as to the wantonness claim.

III. Claims of Negligence/Wantonness Based on the Railroad’s Alleged Failure to Adequately Maintain the Crossing

The plaintiff alleges that the Railroad negligently or wantonly failed to install adequate signs and signals at the crossing. Particularly, the plaintiff claims that the Railroad should have installed automatic flashing lights and an automatic gate arm that would block traffic from proceeding onto the crossing while a train was approaching or passing. The trial court held that these claims were preempted by federal law, or, in the alternative, that they were barred on the basis that Dillard was contributorily negligent as a matter of law. I disagree, and I address both holdings in turn.

(a) Federal Preemption

The starting point for any discussion of federal preemption of state tort law governing railroad crossings must be the United States Supreme Court’s decision in CSX Transp., Inc. v. Easterwood, 507 U.S. 658, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993). In Easterwood, the Court considered whether Easterwood’s claim that the railroad had negligently failed to install adequate warning devices and that that failure resulted in her husband’s death was preempted under the preemptive provisions of the Federal Rail Safety Act (FRSA). 507 U.S. at 661, 668, 113 S.Ct. 1732. The FRSA gave the Secretary of the Department of Transportation “broad powers to ‘prescribe, as necessary, appropriate rules, regulations, orders, and standards for all areas of railroad safety,’ ” subject to the Act’s saving clause for state control. Easterwood, 507 U.S. at 662, 113 S.Ct. 1732.
The Court first noted that under the FRSA, a state could retain its authority over railroad safety until the Secretary adopted rules or regulations. Id. at 662, 113 S.Ct. 1732 (citing 45 U.S.C. § 434). The Court also recognized that in 1973 Congress enacted the Highway Safety Act, making federal funds available to improve crossings. Id. at 663, 113 S.Ct. 1732 (citing 23 U.S.C. § 130). In exchange, the states were required to survey their crossings to identify those needing protective devices, and to establish and implement a schedule of projects for this purpose. 23 U.S.C. § 130(d). The other “conditions on the States’ use of federal aid ... have been set out in regulations promulgated by the Secretary through the Federal Highway Administration (FHWA).” Easterwood, 507 U.S. at 663, 113 S.Ct. 1732.
The defendants in Easterwood argued that the Secretary’s regulations, and specifically 23 C.F.R. §§ 646.214(b)(3) and (4) (1992),[5] preempted Easterwood’s claim. *450 Id. at 663, 113 S.Ct. 1732. The Court found that the regulations did not preempt Easterwood’s claims because the regulations did not apply. Id. at 673, 113 S.Ct. 1732. Thus, the question in this case is the applicability of these regulations to these claims. Section 646.214(b)(3) requires, in a project in which federal funds participate, automatic gates with flashing signals, where, as here, there are multiple main line railroad tracks or a diagnostic team recommends them. Easterwood, 507 U.S. at 666, 113 S.Ct. 1732. Section 646.214(b)(4) deals with crossings not governed by (b)(3) and requires FHWA approval of warning devices required by state law. This regulatory mechanism displaces state and private decision-making. Easterwood, 507 U.S. at 670, 113 S.Ct. 1732.
The issue in this case turns on what activity is required to render either of the regulations applicable. First, one must begin with a “presumption against preemption.” Id. at 668, 113 S.Ct. 1732. Second, to ascertain if the regulations apply, we must determine “whether the preconditions for the application of either regulation have been met.”[6] Id. at 671, 113 S.Ct. 1732.
The Railroad contends that the preconditions of 23 C.F.R. § 646.214(b)(4) have been met in this case, and, therefore, that federal law preempts the plaintiffs claims of inadequate signs and signals. The Railroad argues that the only precondition it needed to satisfy in 23 C.F.R. § 646.214(b)(4) is FHWA approval of the devices at the DeArmanville crossing, and that this approval occurred in 1978 when federal funds were spent at the crossing during Project 1. However, I disagree.
According to the plain language of 23 C.F.R. § 646.214(b)(4) (1998), one of the preconditions to the application of (b)(4) is that “the requirements of [23 C.F.R.] § 646.214(b)(3) are not applicable.” In this case, (b)(3) applies because the DeAr-manville crossing has two main lines and because a diagnostic team recommended the installation of automatic gates and flashing light signals in 1988. See 23 C.F.R. § 646.214(b)(3)(i)(A) and (F). Therefore, the trial court improperly held that (b)(4) was a proper basis for preemption. Thus, the judgment in this case is “in conflict with the plain language of sections (b)(3) and (b)(4).” Armijo v. Atchison, Topeka & S.F. Ry., 87 F.3d 1188, 1193 (10th Cir.1996) (Ebel, J., dissenting); see, also, Eldridge v. Missouri Pacific R.R., 832 F.Supp. 328, 332 (E.D.Okla.1993) (“It is clear from the language of the statute that section (4) does not apply until there has been a determination by a diagnostic team under section 3(ii), either recommending the necessity of automatic gates with flashing signals, or a determination by a diagnostic team that ‘justifies’ dispensing with such a requirement.”); Trevino v. Atchison, Topeka & S.F. Ry., 958 5.W.2d 204, 206 (Tex.Ct.App.1997).
The defendants, however, ask us to overlook the plain meaning of the regulations and to agree with a line of cases *451 holding that the expenditure of federal funds for the installation of passive warning devices[7] amounts to an implied approval by the FHWA that triggers preemption. The trial court accepted this request. I disagree, because those cases must be distinguished from a (b)(3) case such as this one. See Shots v. CSX Transp., Inc., 38 F.3d 304 (7th Cir.1994); Hester v. CSX Transp., Inc., 61 F.3d 382, 386 n. 6 (5th Cir.1995), cert. denied, 516 U.S. 1093, 116 S.Ct. 815, 133 L.Ed.2d 760 (1996) (“Of course, passive warning devices are not adequate where section 646.214(b)(3) applies....”); Trevino, 958 S.W.2d at 210 (Edelman, J., concurring) (“[T]o the extent a (b)(3)(i) crossing has no automatic gate, has received no federal approval for lacking a gate, and federal funds are nevertheless spent on other types of warning devices at the crossing, the objective of the regulation is not achieved, federal approval cannot properly be presumed, and, as alluded to in Hester, pre-emption is not justified.”).
First, the defendants argue that Hester, supra (holding that the plaintiffs state law claims were preempted under (b)(4) because federal funds had been previously approved and expended to install passive warning devices) is persuasive. However, in Hester, the United States Court of Appeals for the Fifth Circuit acknowledged that its holding would have been different if (b)(3) had applied. 61 F.3d at 386 n. 6. Therefore, because this case involves a (b)(3) crossing, as I have discussed above, Hester does not apply.
Second, the trial court’s reliance on Elrod v. Burlington N.R.R., 68 F.3d 241 (8th Cir.1995) (completed installation of passive warning devices with federal funds triggered preemption) is misplaced. In Elrod, the Eighth Circuit stated that preemption was triggered only because the installation of the passive warning devices was complete. 68 F.3d at 244. However, it is clear that when a subsequent inspection by a diagnostic team produces a recommendation for active warning devices, and those devices are not completely installed before the collision (the situation in this case) the Eighth Circuit would not find preemption. See St. Louis Southwestern Ry. v. Malone Freight Lines, Inc., 39 F.3d 864 (8th Cir.1994), cert. denied, 514 U.S. 1110, 115 S.Ct. 1963, 131 L.Ed.2d 854 (1995). Thus, the Eighth Circuit’s position actually favors the plaintiffs argument that her claims are not preempted because active warning devices were not completely installed and operational at the DeArmanville crossing at the time of the collision.
Third, the other cases cited by the Railroad and the trial court rely on the analy-ses of the Fifth and Eighth Circuits, in Hester and Elrod, respectively. Because Hester and Elrod do not apply to this casé, I find these other cases unpersuasive as well.[8] Therefore, I believe that the Railroad has not met the preconditions for applying 23 C.F.R. § 646.214(b)(4), under Easterwood, supra. Thus, the trial court erred when it held that § 646.214(b)(4) preempted the plaintiffs claims.
Finally, I do not believe that the plaintiffs claims are preempted under 23 C.F.R. § 646.214(b)(3) either. Pretermit-ting an analysis of the plain language of (b)(3), I note that a majority of the courts have held that at a (b)(3) crossing, a railroad’s common-law duty of care must continue until the required automatic gates *452 and flashing signals are completely installed and are fully operative. See St. Louis Southwestern Ry. v. Malone Freight Lines, supra, 39 F.3d at 867 (“The view that preemption runs from the time of federal approval [and not installation] is inconsistent with the [Federal Railroad Safety Act’s] goal of promoting safety at railroad crossings.”); Thiele v. Norfolk & W. Ry., 68 F.3d 179, 184 (7th Cir.1995); Hester, 61 F.3d at 386; O’Bannon v. Union Pacific R.R., 960 F.Supp. 1411, 1417 (W.D.Mo.1997); Earwood v. Norfolk S. Ry., 845 F.Supp. 880, 886-87 (N.D.Ga.1993); Carpenter v. Consolidated Rail Corp., 69 Ohio St.3d 259, 262, 631 N.E.2d 607, 610 (1994) (“[b]efore a state law governing warning devices will be deemed preempted, federal funds must actually have been committed and spent, and the [devices actually] installed”); Trevino, 958 S.W.2d at 206, 211; Estate of Martin v. Consolidated Rail Corp., 667 N.E.2d 219 (Ind.Ct.App.1996).[9]
It is clear that the DeArmanville crossing was a (b)(3) crossing, because it had two main lines and a diagnostic team had recommended the installation of automatic gates and flashing light signals back in 1988. See 23 C.F.R. 646.214(b)(3)(i)(A) and (F). Furthermore, it is undisputed that the automatic gates and flashing light signals approved for the DeArmanville crossing were not completely installed and fully operative until two months after Dillard was killed at the crossing. Therefore, in light of the “presumption against preemption” established in Easterwood, supra, and the fact that none of the preconditions for the application of § 646.214(b)(3) or (4) have been met, I conclude that the plaintiffs claims, based on an alleged inadequacy of the signs and signals at the DeArmanville crossing, are not preempted.

(b) The Merits of the Claims Based Upon Inadequate Signs and Signals

The next issue is whether the trial court properly held that these claims were barred because of Dillard’s alleged contributory negligence. As discussed above, I believe the trial court erred when it held that Dillard was contributorily negligent, as a matter of law. Also, contributory negligence is not a defense to the plaintiffs claim that the Railroad wantonly failed to install adequate warning devices. See John R. Cowley & Bros., supra, 569 So.2d at 381.
The plaintiff produced substantial evidence that created a question of fact as to whether the Railroad negligently or wantonly failed to install proper warning devices. The plaintiff established that the Railroad knew about the high number of accidents and fatalities that had occurred at the DeArmanville crossing. The plaintiff also proved that the Railroad participated in, and therefore knew about, the 1988 diagnostic team’s recommendation for the installation of automatic gates and flashing light signals at the DeArmanville crossing, yet did not install those devices until April 26, 1993, after the collision madé the basis of this action. This evidence created a genuine issue of material fact as to the culpability of the Railroad’s failure to install active warning devices at the crossing. Thus, the trial court improperly granted the defendants’ motion for summary judgment on these claims.

Conclusion

The trial court should not have entered the summary judgment on all of the plaintiffs claims. Questions of fact exist as to whether Dillard was contributorily negligent and as to whether the defendants acted negligently or wantonly. Moreover, *453 the trial court erred when it held, as a matter of law, that federal law preempted the plaintiffs claims based upon allegations of inadequate signs and signals and that contributory negligence on the part of Dillard barred the plaintiffs wantonness claims. I would reverse the judgment and remand this case for further proceedings.

. A "diagnostic team" is “a group of knowledgeable representatives of the parties of interest in a railroad-highway crossing or a group of crossings." 23 C.F.R. § 646.204 (1998). It inspects a crossing to determine the warning devices needed pursuant to the requirements of the Highway Safety Act, 23 U.S.C. § 130 et seq.

. "Active warning devices” are "those traffic control devices activated by the approach or presence of a train, such as flashing light signals, automatic gates and similar devices, as well as manually operated devices and crossing watchmen, all of which display to motorists positive warning of the approach or presence of a train." 23 C.F.R. § 646.204 (1998).

. The interplay between state and federal authority is discussed in part III, infra.

. The whistle blasts, they say, consisted of the standard whistle blast after they passed the whistle board before the crossing, and of other short "radical blasts” to “make [Dillard] aware that something was there.”

. 23 C.F.R. § 646.214(b)(3) (1998) reads, in pertinent part:
"(3)(i) Adequate warning devices ... on any project where Federal-aid funds partici *450 pate in the installation of the devices are to include automatic gates with Dashing light signals when one or more of the following conditions exist:
“(A) Multiple main line railroad tracks.
"(F) A diagnostic team recommends them....
"(ii) In individual cases where a diagnostic team justifies that gales are not appropriate, FHWA may find that the above requirements are not applicable."
23 C.F.R. 646.214(b)(4) (1998) reads:
"(4) For crossings where the requirements of § 646.214(b)(3) are not applicable, the type of warning device to be installed, whether the determination is made by a State regulatory agency, State highway agency, and/or the railroad, is subject to the approval of FHWA.”

. One of the preconditions for both regulations is that federal funds were expended to improve the warning devices at the crossing. Because neither party disputes this precondition, I assume, throughout my analysis, that it has been met, and therefore I do not discuss it.

. "Passive warning devices” are "those types of traffic control devices, including signs, markings and other devices, located at or in advance of grade crossings to indicate the presence of a crossing but which do not change aspect upon the approach or presence of a train.” 23 C.F.R. § 646.204 (1998).

. The Tenth Circuit's decision in Armijo v. Atchison, Topeka & S.F. Ry., 87 F.3d 1188 (10th Cir.1996), supports the Railroad's contention. However, the Tenth Circuit based its decision upon Hester, supra, and Elrod, supra, which are distinguishable from (b)(3) cases like this one. Furthermore, I agree with the dissent in Armijo, that the Tenth Circuit’s holding contradicts the plain meaning of the regulations. 87 F.3d at 1193 (Ebel, J., dissenting).

. While some delay in installing automatic gates and flashing light signals may be unavoidable, railroads have, at their disposal, other forms of "active warning devices,” such as "manually operated devices and crossing watchmen.” 23 C.F.R. § 646.204 (1998). Furthermore, in this case, the delay was 5 years, during which 9 of the 18 collisions at this crossing, including all 4 of the collisions involving fatalities, occurred. The majority of courts cited above found such a delay to be unreasonable, and I agree.